UNITED STATES, Appellee

v

THOMAS A. BRIDGES, Airman Third Class, U. S. Air Force, Appellant

12 USCMA 96, 30 CMR 96

No. 14,341

Decided January 13, 1961

 

*Captain William A. Crawford, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Colonel James L. Kilgore.*

*Captain Donald W. Brewer* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Merlin W. Baker* and *Major James Taylor, Jr.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by special court-martial, the accused was found guilty of operating a motor vehicle without the required license, in violation of Uniform Code of Military Justice, Article 92, 10 USC § 892, and wrongful appropriation, in violation of Code, supra, Article 121, 10 USC § 921. He was sentenced to bad-conduct discharge, forfeiture of $70.00 per month for five months, confinement at hard labor for five months, and reduction to the lowest enlisted grade. Intermediate appellate authorities affirmed, and we granted accused's petition for review on the issues whether the president of the court-martial was required to grant a requested defense instruction and whether the court members were authorized to overrule the president's ruling that he would so advise the court.

On November 28, 1959, the accused and an Airman Donovan rode to a hotel in a town near their base in Donovan's car. At Donovan's request, accused drove. After their arrival, accused asked Donovan for a ride to another village in order that he might see a girl. Donovan refused, and informed accused that he intended to leave his car parked at the hotel as he was not sober enough to operate it safely. While Donovan was absent from the room for a few minutes, accused took the car keys which had been left on the table and drove off in the automobile.

Prior to the evening in question, accused had not been permitted to drive Donovan's car, although he was a "good friend," and Donovan "probably would have let him have the car" if he had asked for its loan and if he had been able to produce his operator's permit.

Approximately an hour after Donovan discovered that his car was missing, it was found wrecked near the west gate of the Air Force Base on which both men were stationed. Accused, injured, was lying in the front seat. After his return from the hospital, accused made a voluntary oral statement to a criminal investigator in which the following was set forth:

". . . Airman Donovan got up to go to the latrine and left the keys to his car lying on the table, Airman Bridges stated to me that at this

time he felt that Airman Donovan was becoming intoxicated, that he had seen him before like this, so he thought that he would take the car and bring it back to the base for him, that he did not think Airman Donovan would mind. He stated that he left Stambach and decided to go through the west gate rather than the main gate because there would not be so many people around. He said that after he passed the base he started down a hill and his accelerator stuck, he realized what was happening and he reached down with his hand to try to release it, that the car swerved and went off the road and that was all he remembered."

The location of the car at the time it was discovered was approximately three to four hundred feet beyond the entrance to the Base's west gate and on the road toward the village in which accused's girl friend lived. Skid marks, however, commenced ninety feet prior to the turn for the gate.

Following final arguments in the case, the defense counsel proffered to the president of the court-martial a requested instruction which set forth the following:

"Not every wrongful taking constitutes a violation of UCMJ, Article 121. The intent to deprive the owner of his property, either permanently or temporarily, must include a mens rea. Therefore, the mere borrowing of an article of property without the prior consent of the owner does not make out either of the offenses defined in Article 121. Something more is required, and that something is criminal intention."

Overruling the trial counsel's objection that the requirement of criminal intent was adequately developed by the instruction that accused must be found to have taken Donovan's car "wrongfully," the president granted the defense request. Upon objection by a member of the court, a closed conference occurred without the presence of counsel and the accused. When the court reopened, the president ruled that the instruction would not be given. He did not, however, announce whether his

**98**

former decision had been overruled by a majority vote of the court members during the closed session.

Thereafter, the president advised the members of the court-martial of the elements of the offenses charged and delivered the mandatory advice concerning the presumption of innocence, burden of proof, and reasonable doubt. In accordance with the ruling previously made, he did not enlarge upon the question of criminal intent.

In United States v Hayes, 8 USCMA 627, 25 CMR 131, a majority of this Court pointed out the validity of the concept urged upon the president by the defense counsel. There, we stated, at page 629:

"Not every wrongful taking constitutes a violation of Article 121. See United States v Norris, 2 USCMA 236, 8 CMR 36. The intent to deprive the owner of his property, either permanently or temporarily, must include a *mens rea*. Therefore, the mere 'borrowing' of an article of property without the prior consent of the owner does not make out either of the offenses defined in Article 121. Something more is required, and that something is criminal intention. Thus, if one visits the office of a friend, and, finding him absent, takes a book which he has come to borrow, leaves a note to that effect, and returns the book the next day, there is no intent to steal or misappropriate the book and, necessarily, no violation of Article 121."

In the *Hayes* case, we were faced with evidence which tended to establish that the accused, a finance clerk, arranged for an unauthorized advance pay for another soldier, in violation of regulations, which, however, was to be repaid by monthly deductions from the salary due him. We held, *inter alia*, that "According to the evidence, under proper instructions the court-martial here could have acquitted the accused because of the absence of any criminal intent." United States v Hayes, at page 630. We are faced with a legally identical situation in this record. Here,

the victim testified that he had refused to drive the accused to his sweetheart's home in a nearby village. However, he also indicated that accused did not ask him for the loan of his car; that they were friends; and that, upon determining that accused had a permit, a matter into which he did not inquire, he "probably would have let him have the car." He also admitted informing the accused that he, Donovan, believed himself too intoxicated to drive and intended to leave his car at the hotel. Viewing accused's pretrial statement in light of Donovan's testimony, we cannot say his declaration that he took the car solely to prevent Donovan from driving it while drunk and in order safely to return it to the Air Base is incredible. The physical facts in the record concerning his accident demonstrate that skid marks were found to commence prior to the intersection in the highway leading to the west gate and the fact that he did not have a vehicle operator's permit may well have led accused to the conclusion that it would be desirable to avoid the crowded main gate. While there is certainly room for another view, we believe the proof here is such that the court-martial could reasonably have found that accused lacked the criminal frame of mind necessary for a conviction of wrongful appropriation. United States v Hayes, supra; United States v McArdle, 27 CMR 1006. Accordingly, upon his request, accused was entitled to an instruction which clarified for the court-martial the question of criminal intent and required it to find that he possessed the necessary *mens rea*. While the proposed advice may not have been adequately phrased, it was at least sufficient to put the president on notice that clarification was necessary. United States v Walker, 7 USCMA 669, 23 CMR 133. The subsequent refusal to enlarge upon the matter of intent was, therefore, prejudicial.

Left for consideration is the second issue. While the record reflects only that the president changed ■■■■■■■ ■ his ruling on the request for additional instruction after participation in a closed session with the other members of the court-martial, the fact that such session occurred as the result of a member's objection clearly implies that the reversal of his former position was due to being overruled by a majority vote in closed session. Thus, the question before us is simply whether the members of a special court-martial may properly so overrule the president's rulings concerning instructions. We are certain that their authority does not extend so far.

Code, supra, Article 51, 10 USC § 851, provides pertinently:

"(b) The law officer of a general court-martial and the president of a special court-martial shall rule upon interlocutory questions, other than challenge, arising during the proceedings. Any such ruling made by the law officer of a general court-martial upon any interlocutory question other than a motion for a finding of not guilty, or the question of accused's sanity, is final and constitutes the ruling of the court. . . .

"(c) Before a vote is taken on the findings, the law officer of a general court-martial and the president of a special court-martial shall, in the presence of the accused and counsel, instruct the court as to the elements of the offense and charge the court . . . [concerning the presumption of innocence and reasonable doubt]."

The Government argues that subsections (b) and (c) of Article 51, quoted supra, must be read together and that, so construed, require the president's selection of instructions to be made subject to the objection of any member of the court, thus reducing him to little more than a record spokesman in this case. They arrive at this conclusion by characterizing the granting of instructions as an interlocutory question and contend that all such matters are decided subject to objection. See Manual for Courts-Martial, United States, 1951, paragraphs 40, 57, and United States v Pulliam, 3 USCMA 95, 11 CMR 95.

On the other hand, appellate defense counsel correctly point out that nothing in the legislative background of Code,

supra, Article 51, indicates that Congress intended for the instructional question to be treated as any other interlocutory matter. Indeed, the history of subsection (c) of the Article and the Manual references to it establish the contrary. Thus, in Senate Report No. 486, 81st Congress, 1st Session, at page 23, it was stated that the Article placed upon the president of a special court-martial the affirmative duty of instructing the court as to the elements of the offense, the presumption of innocence, burden of proof, and reasonable doubt. It was further remarked that:

> ". . . This subdivision [c] sets out the minimum requirements as to the scope of the instructions. It will not prevent him from charging on additional rules of law which are germane to the case." [Senate Report No. 486, supra, at page 23.]

The same comments are made in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, at pages 74–75. And in our examination of the provisions of the Manual, supra, we note that, in every instance, its drafters separated the duty to instruct from the president's other responsibilities concerning interlocutory matters. See, for example, Manual, supra, paragraphs 40*b*(2), 57*c*, and 73. Nowhere is there found any indication that the question of granting instructions was to be treated as an ordinary ruling of the court, and, indeed, it is difficult to see how the president could execute his duty in this respect without plenary authority to control the content of his advice.

Moreover, in United States v Pulliam, supra, we expressly saved the question whether the president's duty in the instructional area should not be treated differently from other interlocutory matters. Thus, assuming the accuracy of the Government's contention that Code, supra, Article 51(b), provides authority for the court members to overrule the president's rulings in general, it is equally clear that his action with respect to instructions is final and conclusive. Compare United States v Pulliam, supra, with United States v

**100**

Rinehart, 8 USCMA 402, 24 CMR 212. Otherwise, we would have to attribute to Congress the strange position of, on the one hand, giving the president the duty of instructing but, on the other, taking from him the responsibility of selecting the advice to be delivered. We do not think the legislature intended such an absurd result, and we are required to hold that the ruling of a president of a special court-martial with respect to the granting of instructions is final and not subject to the objection of any member of the court. While he is not wholly a judge, we are certain that Congress did not intend him to be only a figurehead who parrots into the record the conclusions of a majority of the court concerning the law.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Air Force. The board of review may order a rehearing on the charge of wrongful appropriation and the sentence or it may reassess the penalty on the remaining findings of guilty.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The facts are not in dispute in this case and, so far as this member of the Court is concerned, they show beyond all doubt the commission of the crime of unlawful appropriation. After consuming some beer at an airmen's club, the accused and the owner of the car proceeded to a hotel tavern in Stambach, France. While sitting there, the accused requested the owner to drive him to the home of a lady friend in Sarrebourg. The owner refused and informed the accused that he intended to leave the car parked where it was and return to his station by other means. His reason for not using the car to return to the post was because he had consumed some alcoholic beverage and he did not care to risk driving his car under those conditions. Shortly before the refusal, the owner had taken some change from his pocket for the purpose of paying for some drinks and at the same time removed his car keys.

He had placed the money and the keys on the table. When he left the table momentarily to relieve himself, he returned to find the accused, his keys and the car missing. He thereupon obtained a ride to the base, where he was informed his automobile had been wrecked. Accused had not asked nor had the owner given him permission to take his car.

Upon leaving the hotel, the accused drove in the direction of the town where his girl friend resided and while conveniently the post could be reached by the same road, the place where the car was wrecked was beyond the two entrances to the base. There is no dispute about the accused having driven past the main gate and, assuming my associates are correct in the precise location of the skid marks, the car was being driven so rapidly that not only were the tires dragged for at least ninety feet but the car ran off the road through a meadow and was wrecked some three to four hundred feet beyond the turnoff to a side gate. From the markings on the highway, the distance covered, and the damages to the car, it is reasonably inferable that the accused was driving so fast that a turnoff on the secondary road into the camp would have been impossible. I mention this latter piece of evidence not because it might change the nature of the offense but to show the improbability of the accused's pretrial inculpatory unsworn statement that he was merely helping his friend get the car back to camp.

Before discussing the instructional issues, I believe it well to point out a disagreement with my associates' statement that the owner of the car indicated "that, upon determining that accused had a permit, a matter into which he did not inquire, he 'probably would have let him have the car.'" These are the questions and answers upon which they seek to bolster accused's asserted defense:

"Q. Now, you state that you did not give Airman Bridges permission to drive your car at that time—at the time you were in Stambach, is that right?

"A. Right, sir.

"Q. Let me ask you this, because of your relationship with Bridges, would you have given him permission to drive the car if he had asked you?

"A. I would have asked to see his license first, sir.

"Q. And if he had a license?

"A. I probably would have let him have the car, sir."

It is difficult for me to perceive how that adds anything to accused's self-serving statement. It is a supposititious question and, had accused asked to drive the car, his request would have been denied for he had no license. That is positively established for he pleaded guilty to operating the vehicle without such authority. But no matter what interpretation is placed on that testimony, it is crystal clear that accused did not have the owner's permission, either express or implied, to take the vehicle and that he drove it away surreptitiously after having been informed it was to be left in place.

The first error relied on by my associates is that the president of this special court-martial committed prejudicial error when he failed to grant the accused's request for an instruction on criminal intent. In that connection, it is interesting to note that they concede the request was not adequately phrased, but they go on to hold it was at least sufficient to put the president of the court on notice that clarification was necessary. I point out that the record shows trial defense counsel was a certified lawyer. Therefore, it seems my brothers are setting an unreachable standard when they hold that a non-lawyer president of a special court is put on notice that he must clarify simple instructions when presented with a confusing request prepared and submitted by a certified attorney. Without a doubt, I venture to say, had the instruction been given as requested, the members of the special court would have had to search outside authorities to learn the meaning of the phrase "mens rea"—a procedure which this Court has disapproved. They could understand what they were told by the

president; namely, that they must find beyond a reasonable doubt that the accused wrongfully took the automobile of the owner and that the taking was with the intent temporarily to deprive him of his car. Those are the statutory elements of the offense and Congress has decreed that when they have been proved beyond a reasonable doubt, the criminal intent is supplied and the offender is guilty of unlawful appropriation. Accordingly, in addition to being worded so as to confuse, the requested instruction was superfluous.

The principle announced in this case, which seems to strain to escape the statutory definition of unlawful appropriation, certainly will not aid the morale and discipline of members of the armed services. It cannot help but open the flood gates to the unauthorized "help yourself" conversion of someone else's property. No wonder we have an accused protesting his conviction to this Court after defending a larceny charge on the theory that, while he took his buddy's civilian clothing from a locker located in Germany without asking permission, he had no criminal intent because he intended only to take the clothes to New York, wear them while there, and then return them to the owner postage prepaid. United States v Clark, No. 14,506, petition denied December 7, 1960. Perhaps there are those who would contend that is an innocent taking and the owner is without relief, but if such is to be the law then the serviceman's property and his possession thereof will be without legal protection. And in the case of automobiles, the joyrider will have an open road. All he need say is "I had no criminal intent because I thought the owner would not mind," then the president of the court can struggle between instructing on *mens rea* and mistake of fact. Certainly, this is extending the doctrine of innocent book-borrowing, mentioned in United States v Hayes, 8 USCMA 627, 25 CMR 131, a long way but even in that supposititious situation, if the owner informed the borrower prior to the taking that the book was not to be removed from the desk, the taking would not be innocent. Here, it is to be remembered, the accused had been denied the use of the car and had been told it was to remain where parked until at least the next day. Prior thereto —as even accused admitted in a pre-trial statement given after proper warning and which his defense counsel characterized in argument as having been "made voluntarily and in a forthright fashion"—he had never been authorized to borrow the car. And while he had adequate opportunity to make a request, he failed in that regard and took off during a momentary absence of the owner. Of course, according to him— after he wrecked the car—his taking was prompted by an altruistic motive to save the owner from damaging his vehicle. That is a most convenient and, I suggest, not unexpected story for the accused to offer in explanation of demolishing his victim's automobile. If indeed, however, he was so paternalistic and protective of the owner's interests as he would portray himself, I submit it would have been more convenient to have suggested that purported plan to his victim and requested his consent instead of the surreptitious course of action be pursued.

Many civilian jurisdictions subject individuals to criminal sanctions when they take property without the owner's consent, and in the military community I feel that an owner of an automobile should have at least the same protection and the sole right to select who can take and use his vehicle. It is an expensive piece of property, and its loss at times may be catastrophic. If one elects to take a chance and appropriates without permission, it is no defense to say "I thought the owner would not care." If he fails to ask and elects to take the risk, he brings himself within the coverage of the punitive Article. Any other rule breeds disorders and trouble.

My disagreement with the second issue springs from a belief that my brothers are rewriting the Code. Aside from being judicial legislation, the results of this decision will overturn a long-established rule of law and upset a well-recognized method of procedure which has been working reasonably well since this country was founded.

**102**

Moreover, the treatment accorded this issue by my associates should be compared with this concept expressed by a unanimous Court in United States v Pulliam, 3 USCMA 95, 11 CMR 95:

"The functions assigned to the president of a special court-martial as outlined in paragraph 40*b* of the Manual, supra, do not entail the exercise of special talents or attributes not found in court members generally. The only consideration is that of seniority in rank. Any court member, regardless of legal or other training, and regardless of his actual rank, may serve as president of a court if he is, in fact, senior in rank to the other members. With the exception of the administration of oaths, not here involved, these functions are performed in the name of the court. Since his rulings on interlocutory questions are subject to objection by any member he has no separate authority solely as president."

Historically, the military did not have a court headed by a judge or his equivalent. Over the many years, the president of a court-martial was only a mouthpiece and representative of the other members. He had no authority to act on his own, and he was subject to the will of a majority of the members. Colonel Winthrop in his treatise, Military Law and Precedents, 2d ed, 1920 Reprint, page 171, outlined the president's functions in this language:

". . . In the absence of objection, he may direct as to the more familiar points of order and procedure, and will properly take the formal action incidental to the deliberation of the court—such as the submitting to the court of a proposition or motion by a member, the ordering of the courtroom to be cleared when requested by a member, or voted, or when required by law, the declaring of the decision of the court after deliberation had, &c. So, in the absence of objection, or where the acquiescence of the court is to be presumed, he may give assent to a member or the judge advocate leaving his seat for a temporary purpose, to a brief consultation between the accused and his counsel, or other slight matter of indulgence or comity. But in such and all other cases in which he acts as presiding officer, he simply acts for and in the name of the court. Other than as its representative and mouthpiece he has no separate authority. He can make no ruling as to testimony or otherwise, and can announce a ruling only as a conclusion of the court. He can neither act independently of the court, nor can he act against the will of a majority of the court."

Because there was no substantial change in the duties of a president over the intervening years, I skip to the Articles of War as amended by Congress on June 24, 1948. Those Articles of War did not prescribe the duties of the president of a general court-martial, but the Manual for Courts-Martial, U. S. Army, 1949, did. Generally, paragraph 39 of that Manual restates the prior rule that he has the powers, duties and privileges of members in general, and he speaks and acts for them. However, Article of War 8 provided for a law member on a general court, and under Article of War 31 he was given certain powers. I quote the relevant part of the latter Article:

"Voting by members of a general or special court-martial upon questions of challenge, on the findings, and on the sentence shall be by secret written ballot . . . . The law member of a general court-martial or the president of a special court-martial, shall rule in open court upon interlocutory questions, other than challenge, arising during the proceedings: *Provided,* That unless such ruling be made by the law member of a general court-martial, if any member object thereto, the court shall be cleared and closed and the question decided by a majority vote, viva voce, beginning with the junior in rank: *And provided further,* That any such ruling made by the law member of a general court-martial upon any interlocutory question other than a motion for a finding

of not guilty, or the question of accused's sanity, shall be final and shall constitute the ruling of the court; but the law member may in any case consult with the court, in closed session, before making a ruling, and may change any ruling made at any time during the trial."

It will be noted that this Article of War requires a secret ballot on three questions; namely, challenge, findings, and sentence. It then goes on to say that the law member of a general court and the president of a special court shall rule in open court on interlocutory questions, and I particularly call attention to the fact that while Congress made the law member's ruling final on most interlocutory questions, it allowed him to consult in secret deliberations with the other members, which permitted them to have their say off the record. More important, however, Congress specifically stated that unless the ruling was made by a law member—and there was no such functionary on a special court—if any member objected, the court was to be cleared and the question decided by a majority vote. That procedure gave each member of a special court the authority to object to every ruling made by the president and compel a vote on the objection.

When the Uniform Code of Military Justice was adopted, Congress replaced the law member with a law officer, but in this field the extent of the change was principally to require him to rule in the open. No longer could the members of a general court argue about the rulings on interlocutory questions, but the right to object in certain instances was preserved. Even in a general court, there was not a complete divorcement from the prior procedure by the Code; all Congress did was to make a partial separation. But in a special court-martial, no changes of any kind were made in the finality of rulings or the privileges to object.

I just am unable to conjure up any way in which words could speak plainer than they do in Article 51(b) of the Uniform Code, 10 USC § 851. It provides:

"The law officer of a general court-martial and the president of a special court-martial shall rule upon interlocutory questions, other than challenge, arising during the proceedings. Any such ruling made by the law officer of a general court-martial upon any interlocutory question other than a motion for a finding of not guilty, or the question of accused's sanity, is final and constitutes the ruling of the court. However, the law officer may change his ruling at any time during the trial. Unless the ruling is final, if any member objects thereto, the court shall be cleared and closed and the question decided by a voice vote as provided in section 852 of this title (article 52), beginning with the junior in rank."

It is more than happenstance that Congress prescribed finality would only attach to rulings of the law officer and then it carefully set out that his rulings were the rulings of the court. The Article did not bless the rulings of the president of a special court with the aura of finality, and there is a good reason for the silence. So far as legal training is concerned, a law officer must meet certain requirements and be certified as competent to act in that capacity. Not so under the law for a president, and usually he is no more qualified to rule on legal questions than are the other members. But laying that reason to the side, where, I ask, do my associates find any authority to elevate a president of a special court to the bench and grant him the powers of a judge? The authority cannot be found in the Code, and paragraph 57c of the Manual for Courts-Martial, United States, 1951, has this to say:

"The president of a special court-martial will rule in open court upon all interlocutory questions other than challenges arising during the trial, such as questions as to the admissibility of evidence offered during the trial, incompetency of witnesses, continuances, adjournments, recesses, motions, order of the introduction of witnesses, and the propriety of any argument or statement of the trial or defense counsel. If a member objects

to a ruling of the president upon a question, the court shall be closed and the question voted on as stated in 57*f*."

To avoid the necessity of meeting the foregoing arguments head on, my associates say that Congress intended to isolate instructions from other interlocutory questions. I disagree. They are not specifically reserved, and certainly objections to them require interlocutory rulings. In this connection, it is interesting to note that prior to the adoption of the Uniform Code, a president of a special court was required to instruct on those items set out in subsections (1), (2), (3), and (4) of Article 51(c) of the present Act. See Article of War 31, supra. All that was added in the present statute was the requirement that he instruct on the elements of the offense. While these instructions were made mandatory, Congress said nothing about the president having to instruct in the many fields which are incorporated into requests by the parties. This Court is responsible for adding additional instructional requirements, but at no time have we ever suggested that we were changing rulings on additional requests from interlocutory to final rulings. And in that regard, paragraph 57*b* of the current Manual states:

"This paragraph (57) applies to all interlocutory questions arising during the proceedings in open court (i.e., to all questions other than the findings and sentence) except the question of whether a challenge shall be sustained. Any statement or indication in this manual to the effect that a certain question should be decided by the court is not to be understood as making an exception to the foregoing rule. See, for example, 53, 54, 55, 58, and 137."

While, as previously stated, the Code requires the giving of instructions on the elements of the offense, there is no reason why those instructions cannot be questioned by another member of the court. It is conceivable that the president might misstate the law, particularly on the elements of the offense,

and, if his instructions are questioned, the error might be corrected before the court-martial retires to deliberate on findings. However, that situation is not apt to arise. Mostly disputes on instructions will arise only when a party seeks to have the president go beyond the requirements of the Code. That necessarily follows because there must be a ruling by the president before there can be an objection by a member, and a ruling presupposes that one of the parties placed an interlocutory question before the court.

As to the comments that unless the construction advanced in the majority opinion is adopted absurd results would follow, I have only this to say. It is the duty of this Court to interpret Article 51, Uniform Code of Military Justice, supra, as we find it, without reference to whether its provisions are wise or unwise. But, pretermitting that principle and the canon of statutory construction that a plain and unambiguous enactment is to be applied, not construed, Article 51 is not injudicious. Congress had to delegate to someone the duty to be the spokesman for the members of a special court. That responsibility was placed, as it always had been, on the shoulders of the president, but by merely designating him as the oracle of the court, Congress did not clothe him with the powers of a judge or give him more authority on final rulings than was granted to other members. The previous development ought to convince any open-minded reader that, while the authority and precedence of the president of a general court were modified, those running to the president of a special court were unchanged. He is seldom legally trained and if it is absurd to have a question of law determined by a majority of lay members of the court instead of one, then many of our judicial and quasi-judicial bodies and commissions have been set up under similar absurd conditions. Congress undoubtedly concluded that three or more heads were better than one and, if that is absurdity, then so be it. I just do not see it that way and,

**105**

from the language they employed, neither did the members of Congress.

I would affirm the decision of the board of review.