UNITED STATES, Appellee,

v.

Ceon JONES, Private, U.S.
Army, Appellant.

No. 67,230.
CM 9100597.

U.S. Court of Military Appeals.

Argued June 2, 1992.

Decided Sept. 14, 1992.

For Appellant: *Captain Paul H. Turney* (argued); *Lieutenant Colonel James H. Weise, Captain Robert Lane Carey, Captain Robin N. Swope* (on brief); *Colonel Robert B. Kirby and Captain Michael W. Meier.*

For Appellee: *Colonel Dayton M. Cramer* (argued); *Lieutenant Colonel Daniel J. Dell'Orto, Major Joseph C. Swetnam, Captain Marcus A. Brinks* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

On March 22, 1991, appellant was tried at Fort Ord, California, before a military judge sitting alone as a general court-martial. Pursuant to his pleas, he was found guilty of absence without leave (AWOL) (2 days) terminated by apprehension and wrongful appropriation of a vehicle, in violation of Articles 86 and 121, Uniform Code of Military Justice, 10 USC §§ 886 and 921, respectively. Appellant was sentenced to a bad-conduct discharge, confinement for 4 months, and total forfeitures. The convening authority approved the sentence. On August 20, 1991, the Court of Military Review affirmed the findings and the sentence without opinion.

We granted review in this case on the following issue:

WHETHER APPELLANT'S PLEAS OF GUILTY TO WRONGFUL APPROPRIATION OF AN AUTOMOBILE WERE IMPROVIDENT.

We hold that appellant's pleas to wrongfully appropriating his fellow soldier's car were provident and affirm. *See generally United States v. Burnette*, 35 MJ 58 (CMA 1992). *Cf. United States v. Harville*, 14 MJ 270 (CMA 1982).

Appellant was charged with larceny of Specialist White's motor vehicle in violation of Article 121(a)(1). He pleaded not guilty to this offense but guilty to the lesser-included offense of wrongful appropriation of this same motor vehicle. Art. 121(a)(2). Pursuant to his pleas he agreed to a stipulation of fact, which stated:

> On or about 10 January 1991, the accused took a 1984 Ford Thunderbird automobile that belonged to SPC [Specialist] Stephen White, of A Company, 2/58th Aviation Regiment. SPC White allowed the accused to borrow the car; however, it was to be returned later that day. Instead of returning the car as agreed, the accused kept it until he was apprehended in the city of Seaside by Seaside Police Department officers on or about 12 January 1991.
>
> At the time the accused was arrested, he knew that he was not authorized to use the automobile, and he intended to temporarily deprive SPC White of the use of the car and to appropriate it to his own use. In fact, SPC White was deprived of the use of the car for two days.

Appellant was questioned by the military judge about his guilty pleas to wrongful appropriation of Specialist White's car before those pleas were accepted. The following transpired:

Q. What about this car?

A. Okay, sir.

I had talked to Specialist White the night prior, the 9th. And I know Specialist White. We lived in the same barracks. And he agreed to let me use his car.

And I went and ate breakfast the morning of the 10th and called him, and he told me to meet him at his unit, which is 2/58, which is right down the street from PCF. I walked down there.

He had a formation, and he gave me—well, we went back to the barracks where I used to live, and he gave me the car. And he turned it over to me then, at about 8 o'clock that morning—8:30 that morning.

Q. All right.

How long were you suppose to keep it?

A. I was supposed to keep it—I told him I should—I would be back by 5:00—5 o'clock, approximately.

Q. When your pass was over?

A. Yes, sir.

Q. Okay.

A. Yes, sir.

Q. So, what happened?

A. Well, I went back to PCF, and I called him. I called him right from PCF and told him I was back. Now, where he was at that time, I don't know. He wasn't there. I called the CQ and told him to tell Steve—tell him that I was at PCF and I still had his car.

At that time, after the formation, I—when I left again to go back to Salinas to see if I could get my belongings, I—I came back toward—I came back to Fort Ord. And at that time, like I said, sir, I was—I was—I was—I didn't—I wasn't—what I'm trying to say is, I wasn't stealing his car. I called him again.

I called him again from Seaside. At that time, I had taken a couple of drinks and I had checked into a hotel, myself, under my name and everything. And I called him—I called him at—oh, at about 9 o'clock. I called the CQ and let him know—and I asked him to go get Specialist White. Again, he wasn't there, or they didn't go get him.

I don't—I don't know what—what the deal was, sir. But I did call.

Q. Okay.

A. I called three times.

Q. *But you were supposed to give the car back to him at 5:30? Right? When you got back?*

A. *Yes, sir.*

Q. *And then you left at 1800 hours when—you went AWOL again? Right?*

*Or went AWOL from the unit at 1800 hours? Is that right?*
A. Yes, sir.
Q. *And then you took his car? Right?*
A. Yes, sir.
Q. *But you didn't have any permission to take his car after—after that time, did you?*
A. No, sir.
Q. *I know you were going .to—you temporarily deprived him of the use of the car.*
   *Did you keep it for the next two days?*
A. *(Pausing.)*
Q. *When did you give him his car back?*
A. *When they—when they stopped me, sir. He got his car back when they stopped me.*
Q. Okay.
A. But I—
Q. Do you know why they stopped you?
A. Beg your pardon, sir?
Q. Do you know why they stopped you?
A. Do I know why? Yes, sir. I know why now.
Q. They probably got word there was a stolen car? Right?
A. Yes, sir.
   They—well—
Q. In any event, you didn't have permission to have White's car after the 10th, did you? He didn't give you permission to take his car?
A. No, sir. Not—not from his mouth. No, sir.
Q. Well, nobody else gave you permission to take his car, did they? Didn't Specialist White own the car?
A. Yes, sir.
Q. And he didn't give you permission to take it that evening or to keep it the next day or anything, did he?
A. No, sir.
Q. So, you admit that you wrongfully appropriated his car?
A. Yes, sir.
Q. That means: Taking something without permission. You understand that?

A. Yes, sir.
Q. And intending to return it, not to keep it permanently. But you intended to keep it for some period of time, which would deprive him of the use and benefit of the car. You understand that?
A. Yes, sir.

(Emphasis added.)

---

Appellant now claims that his guilty pleas to wrongful appropriation were improvident and must be set aside. *See generally United States v. Adams*, 33 MJ 300 (CMA 1991). Similar to the accused in *United States v. Harville, supra*, he basically contends that he did not have any criminal intent when he withheld his friend's car. He particularly notes four statements in the record which distinguish his case from the rental-car-withholding situation found criminal in *United States v. Hale*, 28 MJ 310 (CMA 1989). In the alternative, he argues that these averred facts at least imposed upon the judge a *sua sponte* duty to question him further concerning his intent in withholding this car. Art. 45(a), UCMJ, 10 USC § 845(a). *See United States v. Caid*, 13 USCMA 348, 32 CMR 348 (1962).

The four matters which appellant asserts undermine his guilty pleas are as follows. First, he notes that he was a friend of the owner, Specialist White, and that he had borrowed the car in the past. Second, he made numerous attempts to contact SPC White to tell him that he was going to keep the car beyond the previously agreed-upon time. Third, during his unsworn sentencing statement, he made various statements which minimized his culpability. He said "I had no intention of taking Specialist White's car. I had no bad thoughts—nothing—you know, nothing bad." Then he went on to say, "I wish he'd have got his messages, because I really feel that if he'd got them—I don't think he would have reported it stolen." Finally, he points out that, during the sentencing phase, Specialist White testified:

Q. Now, Specialist White, if these messages had gotten to you, would you have let him use the car longer?

A. If I had talked with him, I would have—I definitely wouldn't have reported it as stolen.

For several reasons, we hold that these statements neither establish appellant's innocent intent in withholding Specialist White's vehicle nor raise any question concerning the propriety of accepting his guilty pleas in this case.

■ First, a friendly relationship between appellant and Specialist White did not by itself preclude findings of guilty to wrongful appropriation. *See United States v. Johnson*, 17 MJ 73 (CMA 1983). *Cf. United States v. Harville, supra; United States v. Bridges*, 12 USCMA 96, 99, 30 CMR 96, 99 (1961).

■ Second, a unilateral decision on appellant's part to extend the loan of the vehicle did not somehow render his actions not wrongful. *See generally United States v. Norris*, 2 USCMA 236, 239, 8 CMR 36, 39 (1953). The express agreement between the parties was to return the vehicle by 5:30 p.m. on January 10, 1991, and it contained no provision for extensions. Thus, appellant deliberately breached that agreement by keeping it in his possession until January 12, 1991, without securing the owner's permission for such an extension. *United States v. Hale, supra* at 311; *United States v. Johnson, supra. Cf. United States v. Harville, supra* (no breach of agreement); *United States v. Caid, supra* (no agreement). Ineffective notice of this trespass only exacerbated its wrongfulness.

■ Third, appellant's responses to the judge's questions clearly, albeit progressively, established the requisite *mens rea* for the crime of wrongful appropriation. *See generally United States v. McCline*, 32 MJ 356, 358 (CMA 1991). He eventually admitted that he used Specialist White's car in committing the crime of unauthorized absence and that he surrendered this car only upon his arrest. *Cf. United*

*States v. Harville, supra; United States v. Caid*, 13 USCMA at 351, 32 CMR at 351. Thus, appellant's initial reluctance to admit intending to steal gave way to his express but belated recognition that he intended to appropriate the car for his own illegal purposes. That is sufficient "bad intent." *See* Art. 121(a)(2).

■ Finally, Specialist White's testimony on sentencing concerning his possible post-offense approval was totally irrelevant to appellant's guilt. Appellant's state of mind at the time of the offense, not Specialist White's post-offense speculation, was the critical concern on findings. *Cf. United States v. Bridges*, 12 USCMA at 97, 30 CMR at 97.

Appellant could have decided to contest this wrongful-appropriation charge on an implied-consent theory. Moreover, like the accused in *United States v. Harville, supra*, he could have tried to show that his friendship with Specialist White, his repeated attempts to contact him, and his prior history of using the car created a reasonable doubt in his mind as to his lack of authority to keep the car. However, by pleading guilty, appellant admitted these elements of this offense and deprived the Government of the opportunity to rebut these and other defenses. *See United States v. Burnette*, 35 MJ 58 (CMA 1992). Moreover, his invitation to this Court to engage in "post-trial speculation" on these issues cannot now "be countenanced." *See United States v. Prater*, 32 MJ 433, 437–38 (CMA 1991); *United States v. Harrison*, 26 MJ 474, 476 (CMA 1988). Accordingly, since appellant's guilty pleas and the providence inquiry clearly established that he committed this offense, his conviction must stand. *United States v. Thomas*, 33 MJ 224 (CMA 1991). *Cf. United States v. Caid, supra.*

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, and GIERKE concur.

WISS, Judge (dissenting):

In *United States v. Harville*, 14 MJ 270 (CMA 1982), this Court was presented with facts that, in all material respects, parallel those in the case at bar. Unadorned, Harville's testimony in his contested trial was that he believed that he had what amounted to continuing permission from his close friend to borrow her car to go to Texas and that, when he left a note on her door informing her that he had that day taken her car to Texas, he had done all that was required. Unfortunately, his friend did not get Harville's note, and she reported her car missing.

This Court judged that the friend's testimony on behalf of the Government "only indicates that the unexplained disappearance of [her] car resulted from a communication break-down between [her] and appellant as to the extent notice was to be given prior to departure" and, thus, was "insufficient as a matter of law to support" Harville's "conviction of wrongful appropriation." *Id.* at 272. Supporting this conclusion, the Court earlier had reasoned:

"Not every wrongful taking constitutes a violation of Article 121," Uniform Code of Military Justice, 10 USC § 921. *United States v. Hayes*, 8 USCMA 627, 629, 25 CMR 131, 133 (1958); *see United States v. Pelton*, 19 USCMA 131, 41 CMR 131 (1969); *United States v. Caid*, 13 USCMA 348, 32 CMR 348 (1962). "[T]he mere 'borrowing' of an article of property without the prior consent of the owner does not make out either of the offenses under Article 121." *United States v. Hayes, supra* at 629–30, 25 CMR at 133–34. There must be a criminal taking in order to make out an offense under Article 121. *United States v. Bridges*, 12 USCMA 96, 30 CMR 96 (1961). Borrowing an item—even without the owner's consent—does not per se constitute an Article 121 offense. *Mens rea* is required.

14 MJ at 271.

Here, appellant had the expressed permission of his friend to borrow the friend's car for the day on January 10. Appellant told his friend, "I should—I would be back by 5:00—5 o'clock, approximately." Later that day, apparently at approximately that time, appellant returned to the area and telephoned his friend to advise him that he was back. His friend was not there, so appellant left a message with the CQ to tell his friend that he was back and he still had the car.

About 6:00 p.m., appellant decided to go AWOL and used his friend's car to drive to a nearby town. There, he again telephoned his friend; again he was unsuccessful. After having "a couple of drinks" and checking into a hotel, appellant tried again, at about 9:00 p.m., to telephone his friend about the car. Again, though, the friend was not there; and, again, appellant left a message with the CQ that he had called. Unfortunately for appellant, as it had been for Harville, the intended recipient of the messages did not get them, and the friend reported the car stolen.

Appellant made clear that he believed that his friend would let him continue to use the car, and the friend so testified at trial, as the majority acknowledges. Thus, as in *Harville*, appellant indicated that he did only what he believed his friend would let him do and that he fulfilled his responsibility to his friend by leaving messages. Under these circumstances, I do not believe that the military judge adequately resolved the clear inconsistency between appellant's guilty pleas and his insistence on facts that do not demonstrate the requisite *mens rea*.

As *Harville* instructed, the necessary criminal intent—the *mens rea*—is not made out by the mere borrowing of a friend's property. Appellant believed that his friend would permit him to keep the car beyond the agreed-upon return time (and, in fact, because the friend testified that he would have so agreed, that belief certainly was not fanciful), and he tried three times to telephone his friend to obtain expressed permission, leaving messages when unable to reach him.

As in *Harville*, appellant's unresolved assertions reflect that the report of a stolen car entirely "resulted from a communica-

tion break-down," 14 MJ at 272, between appellant and his friend. If this, as a matter of law, is criminal intent, then most of America belongs behind bars.

I would reverse the decision of the Court of Military Review as to Charge II and its specification, set aside the finding thereon and the sentence, and authorize a rehearing thereon.