UNITED STATES, Appellee

v

WILLIAM H. PINKSTON, Sergeant, U. S. Marine Corps, Appellant

6 USCMA 700, 21 CMR 22

701

No. 7040

Decided February 24, 1956

*Commander James A. Brough, USN,* argued the cause for Appellant, Accused. With him on the brief was *Major Melvyn H. Kerr, USMC.*

*Major Charles B. Guy, USMC,* argued the cause for Appellee, United States. With him on the brief was *Captain Carl G. Lutz, USMCR.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was tried and convicted by a special court-martial convened in Hawaii, of a failure to obey the lawful order of a superior officer, in violation of Article 92, Uniform Code of Military Justice, 50 USC § 686. The sentence, as approved by the convening and su-

pervisory authorities, is a bad-conduct discharge, confinement at hard labor for a period of four months, and reduction to the grade of private. A board of review in the office of The Judge Advocate General, United States Navy, affirmed the findings and sentence without opinion. We granted the

accused's petition for review on two issues: (1) the adequacy of the president's instructions to the court, and (2) the legal sufficiency of the evidence to support the findings of guilty.

During an "operational readiness inspection," conducted on October 19, 1954, by the treasurer of the commissioned officer's club at which the accused was serving, the latter's effects were found not to include two required tropical uniforms. He was ordered by the treasurer, a Captain Turner, to procure this apparel by October 22, 1954, and also to have available at that time the quartermaster's slip indicating the date on which, and the person by whom, the purchases were made. The accused acknowledged the order, and spoke no further of the matter to Captain Turner. However, he did not possess the demanded clothing on the date specified.

Testifying in his own behalf at the trial, Pinkston admitted that he had received the order in question; that he had understood its meaning; and that he had failed to comply with it. However, in support of his plea of not guilty, he asserted that it had simply been impossible for him to remedy the uniform deficiency within the prescribed period because of his poor financial situation. In this connection, he testified that, since he was without funds at the time of the order, he had sought immediately to obtain a "checkage" on his pay account. Under this procedure he might have been allowed to draw compensation in advance of pay day—the amount advanced to be diminished by deductions from forthcoming pay periods.

Following the usual chain of command, he presented an oral request to his sergeant-major for an appropriate "checkage." However, it appears that the commanding officer of the accused's unit had previously directed that all such applications be denied, in the absence of emergency need. The stipulated testimony of the sergeant-major fully corroborated the accused's assertion that his application—tendered promptly on the date of the order—had been denied by the former on the theory that the accused's need was not one of a critical character. Thereafter,

Pinkston informed his immediate non-commissioned superior of this development, but was informed that, under the circumstances, he had no choice but to await the following pay day, and thereafter to purchase the necessary uniforms.

According to the accused, the disallowance of his request for a "checkage" effectively exhausted all possibility of obtaining the requisite funds in timely fashion. He had attempted several times to borrow from members of his command for the present purpose, but he had been unable to do so, because it seems to have been recognized universally that he was a "bad loan risk." This unfortunate reputation existed, he said, for the reason that it was known that he was obliged to support not only his wife and infant child, but the offspring of a previous marriage as well.

Prior to its retirement to deliberate on findings, the court was fully and properly instructed for the record by the president on the elements of the offense charged, the presumption of innocence, reasonable doubt, and the burden of proof. No reference was made to the accused's defense of impossibility, and no further instructions were requested either by the prosecution or the defense.

Appellant's initial assignment of error raises the question of whether financial inability may, in an appropriate case, be regarded as a valid defense against a charge of *failure to obey*. We have previously determined that at least one variety of impossibility of performance constitutes a good defense to a charge of *willful disobedience* under Article 91. United States v Heims, 3 USCMA 418, 12 CMR 174; United States v King, 5 USCMA 3, 17 CMR 3. Each of the cited cases concerned an impossibility created by *physical* incapacity. Although *the Court recognized that provision for such a defense had not been made explicitly in the Manual for Courts-Martial, United States, 1951,* it nevertheless determined that the accused's claim of inability, if accepted by the court-martial, amounted to an answer to the Government's charge

since he could not be deemed to have evinced that "intentional defiance of authority" on which criminality is based in these premises.

As in the case of the willful disobedience situation, the current Manual contains no mention of impossibility as a possible defense to a charge of failure to obey. It is arguable that less reason exists for a determination in favor of its utility in a "failure" situation, since in this offense there is involved no content of "intentional defiance," the absence of which was regarded as pivotal in Heims, supra. Appellate defense counsel urged, however, that the rationale of the mentioned cases is applicable—and the Government's lawyers seem to accept this point of view. We are inclined to agree.

It appears to us that, in general, failures to obey may be divided, in terms of source, into two categories. The first of these springs from conduct falling short—perhaps just short—of willful disobedience, and the second is generated by forgetfulness or other cause having its origin in simple negligence. We are concerned here only with the first, and possibly the larger, group—and it seems clear that an offense of this variety possesses at least one basic similarity to an instance of willful disobedience. By this we mean that a failure to obey brought about by such a cause as indifference to recognized authority, general rebelliousness, vague refractoriness, or the like—all wanting in that willfulness requisite for the Article 91 offense—contains some measure of conscious deliberation and choice. Indeed, such a personal decision against compliance is identical in kind, if not in degree or manifestation, to that involved in the more serious offense. By necessity, we believe, such a choice presupposes some degree of voluntariness or purposefulness. And in a situation such as that which now confronts us, it is within this area that the quality of offense—of criminality—lies. In sum, this type of a failure to obey can be considered to involve a sort of *mens rea*—albeit a different and more dilute one than that found in

the crime of willful disobedience. On the other hand such a failure arising out of some aspect of neglect is quite without this factor of election, and is thereby rendered distinct from the situation in which compliance is available and recognized, but is simply not chosen.

Since it appears that the accused was *prepared* to obey the order, ostensibly at least, but was prevented from doing so by the existence or intervention of an extrinsic fact over which, for the time, he could exercise no control, that necessary element of voluntariness is absent.

Certainly, every conceivable "incapacity" cannot exonerate from criminal accountability. As we said in this regard in United States v Heims, supra:

". . . Incapacity, of course, may be—to some extent, at least—a matter of degree . . . . Inability . . . must, we think, be weighed in the balances of reasonableness. . . . In view of this essential element of reasonableness, it seems impossible to formulate a general rule for application to all cases. Perforce each must rest largely on the conclusions of the triers of fact, reached after a consideration of all of the evidence presented, together with the realities of the situation as evaluated by rational military persons, and against a background of the transaction's total setting."

Therefore—while making no attempt to devise a universal solvent for application in this area—we deem it sufficient to hold here that impossibility of compliance with an order to purchase goods within an assigned time, which inability is brought about by financial incapacity, raises an affirmative defense to a charge of misconduct laid under Article 92 of the Code.

We are not unaware of the Service conception that Article 92 provides for an "insurer" type of crime—that is, one with respect to which the existence of any sort of affirmative defense is precluded by the very nature of the charge. We appreciate that the present ruling will have some effect on the

794

conduct and possible result of future prosecutions based on failures to obey. Whereas the result was once dependent solely on satisfactory proof of the basic elements of the offense, these latter, standing alone, are insufficient, where the accused adduces believable evidence establishing a defense such as that with which we are presently concerned. To this extent, therefore, Article 92 is not an "insurer" offense. However, this result, we believe, is demanded by considerations of essential fairness. To view the problem otherwise would serve to perpetuate a result based soley on the strict and empty letter of the Manual's language—one entirely devoid of regard for the manifest and overriding spirit of moderation implicit in every segment of the Code and the Manual. We refuse to hold, under the facts of this case, that the accused must be deemed guilty of a criminal offense, no matter how sincerely he may have sought to comply with Captain Turner's direction. Any other result is downright shocking.

It has been observed earlier that there was no request to this special court-martial for further instructions. Was it nevertheless necessary for the senior member to instruct respecting the claimed incapacity? We have previously held that the law officer of a general court-martial is required to instruct *sua sponte* where the evidence operates fairly to raise an affirmative defense. United States v Ginn, 1 USCMA 453, 4 CMR 45; United States v Miller, 2 USCMA 194, 7 CMR 70. And we have applied this principle specifically to the defense of physical incapacity. United States v Heims, supra. United States v King, supra. Cf. United States v Latsis, 5 USCMA 596, 18 CMR 220. But shall a similar requirement be applied to the president of a special court-martial?

It cannot be denied that legal qualifications equivalent to those possessed by the general court's law officer may not be demanded of the president of a special court-martial in all instances. Thus this Court has held that "the functions assigned to the president of a special court-martial as outlined in paragraph 40*b* of the Manual, supra, do not entail the exercise of special talents or attributes not found in court members generally." United States v Pulliam, 3 USCMA 95, 97, 11 CMR 95, 97. However, in certain situations it has been necessary to impose on the president of a special court-martial instructional duties which require powers of legal discernment approximating those of a qualified law officer. For example, this Court has interpreted the provisions of paragraph 73*a* of the current Manual for Courts-Martial—which impose an equivalent duty on a law officer and the president of a special court-martial to instruct *sua sponte* respecting the elements of an offense charged—to include instructions on all lesser included offenses reasonably raised by the evidence. United States v Clark, 1 USCMA 201, 2 CMR 107. And an identical view was expressed implicitly in United States v Aldridge, 2 USCMA 330, 8 CMR 130, which involved the legal sufficiency of the instructions supplied there.

These holdings were made—despite the realistic recognition expressed and implied in general terms in the Pulliam case, supra—for the reason that no reasonable alternative was open. Almost never, of course, are the members of either a special or a general court professional lawyers—and this should startle no one, for in the main the Uniform Code contemplates an assimilation of the members of a court-martial to those of a civilian petit jury. Certainly the basic functions of the two are markedly similar, and involve principally (1) the making of determinations of fact, (2) the application of law thereto, and (3) the rendition of a general verdict—in the military scene called findings of guilty or the reverse.

It follows that the "jury" must necessarily derive its information concerning applicable law from *some* source. So this knowledge must come either (1) from its own independent and unsupervised researches, or (2) by way of advice and instruction—either on or off the record—from a designated functionary or agency. In the instance of the special court-martial, military law has selected the body's president to per-

form this task, and has provided that he shall speak for the record. Conceding that the frequent—indeed the usual—president of such a tribunal is without professional legal training, it can scarcely be denied that, in terms of choice, record instructions from him are likely to serve the purpose better than the only logical alternative, and much to be preferred over it. Among other reasons, this is true because invariably he will be found to be a relatively senior officer of more mature years and greater experience than other members of the tribunal. We believe that the soundness of this observation requires no demonstration, for it must be manifest that so long as a punitive discharge, with all of its adverse consequences—practical and legal, temporary and permanent—may be imposed by a special court-martial, substantial procedural distinctions cannot be made with safety between this judicial agency and its senior relative, the general court. Therefore, no valid reason exists for protecting the same official from the duty of instructing on such an affirmative defense as is found in this case. It is clear that the latter burden demands no whit more of expertness than does the former. Indeed, it is distinctly arguable that it requires less—this for the reason that in the ordinary case, the appearance of an affirmative defense at the trial may be recognized with greater ease than may the presence of evidence reasonably raising the possibility of guilt of one or some lesser offenses included within that charged. What we are seeking to suggest is the likelihood that performance of the first chore may be entrusted to a nonlawyer with greater assurance of success than may that of the second—simply because it is a less complex and more obvious professional task.

Moreover, a conclusion against the imposition of such a *sua sponte* burden on the president of a special court-martial would of necessity—if the issue is to be put before the tribunal—place an inescapable duty to *request* appropriate instructions on the back of the accused's lawyer at the trial. And we cannot accede to this. We have

**706**

earlier and repeatedly recognized the fact that, for the most part, defense counsel appearing before special courts-martial are not qualified attorneys any more than is the president—certainly they need not be under the law. We have always been unwilling to charge against accused persons waivers based on the conduct of counsel of this description. See, e.g., United States v Moore, 4 USCMA 675, 677, 16 CMR 249, 251. It appears, incidentally, that, in the present case, the two junior officers, who served as defense and assistant defense counsel respectively, affirmatively were shown by the record not to be lawyers. It does not appear whether the Marine Corps lieutenant colonel who acted as president of the court-martial was a lawyer—but it is conceded as probable that he also was not a qualified attorney.

In short—and as a general rule—the law established for the guidance of the military judicial system by this Court must attach with equal force to every tribunal over which we exercise appellate jurisdiction. Our instructional decisions dictated clearly the conclusions we reached in the Heims and King cases, supra. Faced now with a similar problem found in this lower court, consistency, and especially sound practice, demands that we come to an identical result.

Of course, neither the president of a special court, nor the law officer of a general, will be required to supply such an instruction unless the issue has been raised reasonably by evidence brought before the judicial agency. United States v Stout, 1 USCMA 639, 5 CMR 67, and cases cited. However, in the present case, there can be no doubt that the claimed inability of the appellant to comply with the order in suit was squarely placed before the court's members. The accused's testimony concerning his efforts to secure a "checkage" was completely corroborated—as was that having to do with the refusal of his request. Nor was his story regarding his failure to secure the necessary funds elsewhere either incredible, inherently improbable, or otherwise unworthy of belief. In other

words, the appellant's account was sufficient, in our view, fairly to raise the issue of incapacity for the court's consideration. United States v Simmons, 1 USCMA 691, 5 CMR 119. That he may not have done *all* that he possibly could in the premises is plainly beside the point—so far as raising the issue is concerned. Any omission of his to plumb every conceivable source of funds is relevant only as it may serve to throw light on the "jury" question of whether impossibility exists in fact.

Moreover, and apart from his unfortunate credit rating, a loan from Sergeant Pinkston's service associates would probably have been difficult to obtain—this for the reason that existing Naval regulations place severe restrictions on certain aspects of this practice. Articles 1259, 1260, United States Naval Regulations, 1948. It is also to be observed that the Government's lawyer at the trial conceded in his opening argument that the accused had genuinely attempted to obtain the necessary funds. Of course, he thereafter argued, in effect, that these efforts would not serve to avail the latter here —because the charge is one of failure to obey, and not of willful disobedience, with the result that conviction is inescapable, once the fact of a failure is established beyond reasonable doubt. Following this presentation—and supplied with no more than the bare elements of the offense alleged—the members of the court plainly had no choice but to convict. In such a setting, the president's omission was manifestly prejudicial to the accused, and demands reversal.

Since the conclusion we have reached on the initial assignment of error is dispositive of this appeal, we need not consider the second in detail. Suffice it to say, however, that, had all issues been submitted to the court here under proper instructions, we would have no disposition to question the legal sufficiency of the evidence to support findings of guilty.

Accordingly, the decision of the board of review must be, and hereby is, reversed. A rehearing is ordered.

LATIMER, Judge (concurring in the result):

I concur in the result.

The accused's testimony raised reasonably the issue that it was impossible for him to comply with the order, and the instructions given by the president of the court neither directed the court's attention to that ingredient nor required that it be considered in arriving at a finding. Under those circumstances, the court-martial could find the accused guilty, even though the members believed it was impossible for him to comply with the order. That is not the law, and so a reversal is required.