UNITED STATES, Appellee

v

JOHN C. PITTS, Steward First Class, U. S. Navy, Appellant

12 USCMA 106, 30 CMR 106

No. 14,092

Decided January 13, 1961

Commander *David Bolton*, USN, and Lieutenant Colonel *M. G. Truesdale*, USMC, were on the brief for Appellant, Accused.

Commander *Craig McKee*, USN, and Lieutenant *John W. Boult*, USNR, were on the brief for Appellee, United States.

Opinion of the Court

GEORGE W. LATIMER, Judge:

Accused was convicted by special court-martial for larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and was sentenced to bad-conduct discharge, confinement at hard labor for three months, forfeiture of $40.00 per month for that same period, and reduction to the grade of stewardsman recruit. Intermediate appellate authorities approved the findings but reduced the sentence to bad-conduct discharge, suspended with provision for automatic remission, forfeiture of $15.00 per month for three months, and reduction. Thereafter, accused petitioned this Court for grant of review and we allowed argument on the single issue of whether he was entitled to an instruction on mistake.

In order properly to frame the issue, it will be helpful to set forth the circumstances of the accused's offense. Evidence presented at trial showed that one of his subordinates in a Navy galley observed accused removing certain meat and thereupon notified security personnel. Later that afternoon, as accused was driving off the base, he was stopped at the gate and apprehended. At that time, as he was being apprised he was suspected of theft and properly warned of his rights, accused interrupted, and exclaimed spontaneously to one of the investigators, "You got me," or words to that effect. The authorities then conducted a legal search of his car, and in the trunk found a box containing a quantity of steaks and ham—the property which was the subject of the instant crime. Subsequently, and after completion of appropriate warning, accused orally stated to the investigators that he was taking the meat to a woman's residence in a nearby city. The next morning, accused was questioned further, at which time he executed a voluntary written statement. Therein he admitted he had removed the meat from the galley, put it in between the front and rear seats of his automobile, and subsequently moved it to the trunk where it was discovered when he was apprehended as he attempted to leave the base. In this conversation for the first time he claimed that the meat was to be turned over to personnel at Yard Craft, but significantly the written document included the statement he was glad he got caught.

At trial accused testified as a witness in his own behalf. He reiterated his previous declaration that he had taken the meat for people at Yard Craft, but he expanded his earlier version by stating that he was surprised it had been found in his trunk. At this stage of the proceedings he advanced the story that he had made arrangements with an unidentified enlisted man to drive his car and deliver the meat to Yard Craft personnel and thought that delivery had been made. He admitted having made prior contrary statements, but sought to explain that fact by saying he had done so to protect personnel whom he had not wanted to involve.

However, even when pressed at trial, he failed to identify any of the individuals whom he allegedly sought to protect. As he proceeded with his testimony accused contended the meat was to have been delivered as part of a "cumshaw deal" in exchange for some silver paint and two record books he had obtained for use in the galley. He explained he had undertaken this method to acquire those items because they were unavailable through his unit supply channels due to lack of funds, and stated he did not think he was doing anything wrong in arranging such an exchange of meat for other supplies, since until consumed the supplies belonged to the Government. From other witnesses the defense elicited some equivocal testimony about a custom known in the Navy as "cumshaw" whereby goods were bartered or traded from department to department in order to avoid delays, technicalities and red tape incident to acquisition through regular supply channels.

Upon the basis of the foregoing evidence, appellate defense counsel assert that an issue of mistake was reasonably raised, and that the president of this special court erred prejudicially in failing to instruct thereupon even though at trial accused's certified military counsel and his individual civilian defense counsel, who was also qualified within the meaning of Article 27(b), Uniform Code of Military Justice, 10 USC § 827, requested no such charge and indicated satisfaction with the instructions given. See United States v Pinkston, 6 USCMA 700, 21 CMR 22; United States v Miller, 2 USCMA 194, 7 CMR 70. While those facts raise the doctrine of waiver, there is no need to pass on that principle.

It is well settled that an honest mistake, whether of fact or of law, constitutes a defense to a charge of larceny. United States v Rowan, 4 USCMA 430, 16 CMR 4; United States v Sicley, 6 USCMA 402, 20 CMR 118. The question before us in this instance then, as I view it, is simply whether the defense testimony made necessary a *sua sponte* instruction on

mistake, for we have long adhered to the rule that instructions on affirmative defenses, like included offenses, are not required unless reasonably raised by the evidence. United States v Clark, 1 USCMA 201, 2 CMR 107; United States v Simmons, 1 USCMA 691, 5 CMR 119; United States v Rodriguez-Suarez, 4 USCMA 679, 16 CMR 253; United States v Hamilton, 10 USCMA 130, 27 CMR 204. I encounter little difficulty in concluding no such issue was presented.

Accused's contention at trial that he was surprised when the meat was still in his automobile as he ▌ attempted to leave the base rings hollow in the face of the guilt he evinced just prior to its discovery by interrupting the warning to exclaim, "You got me," and his admission in his second pretrial statement that he was glad he got caught. Likewise, his failure, from apprehension even through trial, to identify any of the individuals whom his various explanations involved, raises substantial doubts about his claim that he believed honestly that he was authorized to barter and exchange. Cf. United States v Boyd, 7 USCMA 380, 22 CMR 170. It is unnecessary, however, to rely on the glaring discrepancies in his testimony for, even when full credence is attached to all the evidence presented by the defense, I find no issue requiring an instruction on mistake.

The alleged custom upon which accused bases his appeal before this Court unquestionably amounts to larceny. See United States v Miles, 11 USCMA 622, 29 CMR 438. Indeed, by his testimony at trial, accused admitted he took rations issued for the consumption of members of his organization intending to give them to others in another unit who were not entitled thereto. Accordingly, unless it can be said he honestly labored under the belief he was legally authorized to do so, there can be no question as to his guilt. True it is that the defense elicited from some witnesses testimony indicating an awareness of a sort of practice in the Navy called "cumshaw." Those witnesses, though, were somewhat hazy and uncertain as to whether such conduct was not criminal. That, however, is of no moment, for any mistake must, under the law, be an honest one on accused's part. And, although he asserted that his transaction was in keeping with the norms of the station, singularly missing from his testimony is any statement that he honestly believed the custom was legal or even defensible. Rather, he merely said he did not think he was doing anything wrong or that his actions constituted stealing because the Government would not be cheated.

That contention, of course, lacks evidentiary support, overlooks the rights of individuals to their fair share of rations, and is quite contrary to accused's other sworn testimony. Obviously, if he honestly believed he was operating within legal limits, he would have no reason to falsify when first apprehended as there would be no necessity to protect other persons. Moreover, accused admitted he was aware the items for which he allegedly attempted to exchange the meat were unavailable through proper supply channels of his own unit, for he was so informed when he inquired there and was apprised they were out of money to procure them. Yet, despite that fact and contrary to regulations and orders, he prescribed his own rules in the areas of approved expenditures, ration controls, inventory accountability, and fiscal appropriations, and deliberately set about circumventing the limitations of regular supply channels and their necessary attendant controls. Moreover, concerning the other end of the transaction, accused himself, in his testimony at trial, stated his knowledge that Yard Craft personnel had their own mess facilities. Under these circumstances, it is impossible to conceive how he could have believed honestly that the members of his unit could be denied their authorized quantity of food and other individuals would be legitimately entitled to extra rations. In addition, it is to be remembered that the accused's superior officer testified that some time before the date of the instant offense, he had issued "a direct order that nothing was to go out of the galley unless it was authorized."

Accordingly, even assuming that the improper conversion of some forms of property might be so widespread as to mislead a novice into believing it was not illegal, that would not absolve him from criminal liability if he dealt with foodstuffs which had been banned. Moreover, this accused was not a neophyte who was unacquainted with property issuance, use and accountability, for he has had some seventeen years of service in the Navy. With that experience and in the light of this record, no reasonable person could conclude the accused took the foodstuff under an honest belief that he was rightfully converting rations to the Government's ultimate benefit.

Accordingly, I conclude no issue of mistake was raised reasonably by the evidence, and the Chief Judge joins in that holding. The decision of the board of review, therefore, is affirmed.

QUINN, Chief Judge (concurring in the result):

Assuming the practice of informal exchange or barter of items of supply between different units of the same service for military use negatives the existence of the specific criminal intent required to support a conviction for larceny (see United States v Miles, 11 USCMA 622, 29 CMR 438), the fact of the matter is that the accused here did not say the meat he took was intended exclusively for that purpose.

According to defense witnesses, material obtained by "cumshaw" or informal exchange must be for service use; if the exchange is for personal use, it is not permissible. As one defense witness put it, the exchange must be "for the good of the Navy" and not for personal use. It is in effect a practical device for cutting the "red tape" of regular supply procedure. Two admissions by the accused in his testimony show clearly that his taking was not for a genuine "cumshaw" transaction. Thus, the accused admitted that when he gave the meat to an unnamed and unidentified "kid from Yard Craft," he thought the youngster was *"going to carry it home."* Elsewhere in his testimony, the accused acknowledged that the written statement he gave the law enforcement agents the morning after his apprehension was "a true statement" of the incident. In that statement, the accused said he "held out" about fifteen pounds of steaks and hams; only "some of" it was to be turned over to Yard Craft. Implicit in this admission of partial turnover is the idea that the accused intended to keep the remainder of the meat for himself. His testimony, therefore, raises no issue of honest mistake; and, in fact, it constitutes a judicial confession of larceny. See United States v Miles, supra, page 625. For these reasons, I concur in affirming the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

If we are authorized to weigh again the evidence in a record, judge the credibility of witnesses, and accord conclusive effect to the testimony of one witness over another, all the while disregarding precedents set in our former holdings, then I can agree that we may reject this accused's defense of mistake and conclude that no instructions thereon were required. However, as has elsewhere been noted, we must take the record as we find it and limit ourselves to questions of law rather than the resolution of issues of fact. United States v Brand, 10 USCMA 437, 28 CMR 3; United States v O'Neal, 1 USCMA 138, 2 CMR 44. Nor do the iniquities which may result from departures from normal supply channels justify our judging of the accused's story and its rejection out of hand, without regard to similar cases heretofore reversed. In my view, the record raises the issue of mistake and required instructions thereon by the president. Accordingly, I am unable to join either in my brothers' rationale or their disposition of the case.

The accused was a cook in charge of a Navy galley. He was apprehended in possession of a box of meats, belonging to the United States, while leaving his station. Although he initially told conflicting stories to naval investigators, he subsequently averred in both a written pretrial statement and his trial

testimony that he had traded meat to other naval personnel for paint and record books to be used in his galley. At the trial, he declared he was unaware that his participation in this "cumshaw deal" involved any wrongdoing and that he believed he was authorized to engage in such transactions in order to procure supplies not otherwise available. Other witnesses testified to the existence of this "swapping" process in the Navy and stated it was customarily employed to avoid supply deficiencies.

In my opinion, the foregoing evidence places in issue the question whether the accused operated under an honest and material mistake at the time he took the meat in question from his galley. Indeed, the circumstances are remarkably similar to those of United States v Thornton, 8 USCMA 446, 24 CMR 256. In that case, an Army lieutenant was charged with larceny and making false official statements. The larceny charge was based upon the accused's successful scheme to obtain compensation for his overtime work as officer-in-charge of a hobby shop by inflating the payroll reports of his employees. Accused alleged that the plan had been suggested and specifically approved by his superior officer. Of the effect of this claim, we said, over Judge Latimer's dissent:

"In reviewing the case, the board of review held that the 'major factual issue' was the accused's explanation of his actions. Nevertheless, it concluded that the witness' testimony was immaterial. On that point we reach a different conclusion. *Under the evidence, the court-martial could have found that the accused honestly believed he was entitled to be paid for the services he performed in accordance with the adopted plan.* . . . If the court-martial so found, it would have been duty-bound to acquit the accused of larceny because of the absence of the required criminal intent." [Emphasis supplied.] [United States v Thornton, supra, at page 449.]

Similarly, in United States v Hayes, 8 USCMA 627, 25 CMR 131, upon the accused claiming that he possessed no criminal intent when, as a finance clerk, he approved advance receipt of pay by a friend contrary to regulations, with the understanding that the "loan" of Government funds would be repaid by deductions from the friend's pay, we reversed his conviction of larceny, again over Judge Latimer's dissent, stating at page 629:

"Not every wrongful taking constitutes a violation of Article 121. See United States v Norris, 2 US CMA 236, 8 CMR 36. The intent to deprive the owner of his property, either permanently or temporarily, must include a *mens rea.* Therefore, the mere 'borrowing' of an article of property without the prior consent of the owner does not make out either of the offenses defined in Article 121. . . . According to the evidence, under proper instructions the court-martial here could have acquitted the accused because of the absence of any criminal intent."

This principle was just reiterated by the Court in United States v Bridges, 12 USCMA 96, 30 CMR 96, decided this date, wherein the accused, charged with wrongful appropriation, took his victim's car allegedly for the purpose of preventing the victim from driving it while intoxicated.

Measured by the foregoing cases, it is clear that the accused's claim, that he did not believe his "swapping" of meat, in accordance with a customary practice, for needed supplies involved any wrongdoing, reasonably placed the defense of honest mistake in issue. Accordingly, appropriate instructions were required and the failure to give them was reversible error. United States v Thornton, supra; United States v Bridges, supra.

The principal opinion, however, attempts to negate the effect of the concepts set forth in United States v Thornton, United States v Hayes, and United States v Bridges, all supra, by reliance on United States v Miles, 11 USCMA 622, 29 CMR 438. While I also dissented in that case, I merely point out that *Miles,* supra, involved the

110

providence of a guilty plea and may safely be distinguished from a cause in which, as here, the accused pleaded not guilty and placed in evidence sufficient circumstances to support a defense of mistake.

In sum, I suspect that the affirmance of this case is based both upon Judge Latimer's disagreement with the cases noted above and a disinclination to accord credibility to the accused. As the former rationale has twice been rejected by myself and the Chief Judge and as the accused's account cannot, under any view, be termed inherently incredible, I am unable to join my brothers in their conclusion that proper instructions on mistake were not required. Accordingly, I must record my disagreement with the disposition afforded this case.

I would reverse the decision of the board of review and order a rehearing.