UNITED STATES, Appellee

v

FELIX S. SATEY, Major, U. S. Army, Appellant

16 USCMA 100, 36 CMR 256

No. 18,937

March 11, 1966

*George W. Latimer, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Calvin A. Behle, Esquire, Colonel Joseph L. Chalk,* and *Captain John C. Holzer.*

*Captain Anthony L. Tersigni* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

The appellant, Major Felix S. Satey, was tried by general court-martial, convened at Fort Gordon, Georgia, on eight specifications of larceny from the United States Government and two specifications of signing a false official record, in violation of the Uniform Code of Military Justice, Articles 121 and 107, 10 USC §§ 921 and 907,

respectively. He pleaded not guilty. The appellant was found not guilty of two specifications of larceny and two specifications of signing a false official record, but otherwise guilty as charged. He was sentenced to dismissal, confinement at hard labor for eight years, and total forfeitures. The convening authority reduced the confinement at hard labor to seven years and otherwise approved the sentence. A board of review in the office of The Judge Advocate General of the Army affirmed the findings and the sentence. We granted appellant's petition for review to consider several assignments of error.

The appellant was assigned to the Logistics Division (G–4) within the Headquarters of the Signal Training Center, Fort Gordon, Georgia, in July 1960. While he was in Logistics, the appellant was given many duties. From December 1960 to July 1961 he was projects officer. From March 1961 through September 1961, the appellant was chief of the Training Aids Branch within the Logistics Division. After October 1, 1961, the appellant remained in the Logistics Division as Chief of the Supply Branch until he departed Fort Gordon on a permanent change of station in December 1961.

The Imprest Fund was a petty cash fund regulated by Army Regulations 37–103–1. Expenditures from this fund were limited to nonstock or nonrecurring items, and no more than $100.00 could be paid to a vendor on any one day. Items to be purchased from this fund had to be approved by the Imprest Fund cashier, and an elaborate system of requests and receipts was set up to insure compliance with the regulations governing the Imprest Fund. The expenditures from the Imprest Fund were not allowed to be paid on any type of charge account since items purchased from the fund had to be paid for in cash and delivered at the time of the purchase.

While the appellant was in the Logistics Division, he set up what amounted to charge accounts with several merchants in Augusta, Georgia. Items purchased at the appellant's direction were charged to these accounts and then paid for out of the Imprest Fund. The regulations were circumvented by the submission of false invoices and receipts, showing the purchase of items that were never actually received. Some of the merchandise purchased with Imprest Fund money at the appellant's direction went to the benefit of the appellant personally and to the general benefit of his conspirators. Other unauthorized purchases were for and went to the benefit of the Signal Training Center at Fort Gordon, Georgia.

The appellant admitted making some of the purchases of merchandise that were for the benefit of the Signal Training Center, but he contended they were made only at the direction of the Chief of Staff. He further contended he at no time directed that any of this merchandise be paid for out of the Imprest Fund, and that he actually made no specific arrangements for payment. The appellant also denied purchasing any items for his own use with money from the Imprest Fund.

The record is voluminous and it would serve no useful purpose to attempt to set out the evidence offered to sustain the various charges and specifications. It will suffice to discuss so much thereof as seems necessary to a resolution of the various assignments of error.

We first consider the claimed offenses in violation of Article 121, Uniform Code of Military Justice, supra, as alleged in specifications 2, 3, 4, and 7 of Charge I. (Appellant was acquitted of the alleged violations contained in specifications 6 and 8 of Charge I, and we shall deal separately with specifications 1 and 5, hereinafter.) Each of these four specifications alleged the larceny of a stated sum of United States currency, the property of the United States Government. As the staff judge advocate summarized in his post-trial review, evidence was presented in support of these counts, to indicate that the Imprest Fund was used in an unauthorized manner. Unauthorized Imprest Fund charge accounts were estab-

102

lished with local vendors and the military purchasing agents obtained services, materials, furniture, and appliances which were not proper subjects for Imprest Fund purchase. It appears from the record that much of the material and equipment obtained by Imprest Fund purchase during the periods of time covered by these specifications should have been acquired, if at all, through other authorized methods of procurement. The projects into which much of the equipment and material were funneled were: The "In-Processing" building; a "Best Mess Hall" project; a photo lab; and a skeet range.

In obtaining supplies, equipment, appliances, and furniture for these and other purposes, the requisitions were falsified to bring the purchases within the $100.00 limit for Imprest Fund purchase, and in numerous instances to the extent of reflecting items which were not obtained. In actual operations the requisitions, invoices from vendors, and sub-voucher receipts for cash were so often falsified, in whole or in part, that it is almost impossible to establish with mathematical certainty whether or not a particular set of documents represents a real transaction or a subterfuge to permit a payment out of Imprest Funds on a "charge account."

The defense position was that the appellant was not personally responsible for any of these accounts; and the items purchased, although obtained in contravention of regulations, nevertheless found their way into Government use. Furthermore, the accused received no personal gain, and any of his activities in connection with the projects which did in fact benefit, were a result of direction from his military superiors. The prosecution, on the other hand, took the position that the appellant was responsible either directly or through agents for the improper disbursements of Imprest Funds, and, while operating on the theory that improper disbursement alone is enough to amount to larceny, the prosecution attempted nevertheless to show actual or probable personal gain to the accused and others in each case.

The evidence is overwhelming to show that a great amount of the material, equipment, and other items so procured, did go into the above-named projects and did go to the use and benefit of the Government at Fort Gordon. There is evidence sufficient to show, or at least infer, that some of such items went to the benefit of appellant and the noncommissioned officers who were acting as purchasing agents under appellant's direction, and that appellant either knew thereof or consented thereto. As to the four specifications presently under discussion, for us and, we believe for the court-martial to segregate those items which went to personal use from those which went to the use and benefit of the Government, seems impossible.

In his instructions to the court, the law officer correctly defined the offense of larceny and detailed the elements of that offense. He included the following element:

"(4) That the taking by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property, or permanently appropriate the same to his own use, or the use of any other person other than the true owner.

"Gentlemen, in this connection, where the word 'person' appears, the United States Government can be considered as a person."

We find no fault with the definition of the offense of larceny as given by the law officer nor with his tailoring of the facts to the law as contained in his instructions. At the request of the Government, however, the law officer also instructed the court as follows:

"You are advised that an intentional diversion of Imprest Fund monies for purposes other than that intended by Imprest Fund Regulations is larceny if the perpetrator intended permanently to deprive the Imprest Fund of the use and benefit of the Imprest Fund monies. It is not necessary for conviction of larceny that the perpetrator benefit personally or actually receive the

monies, nor is it a defense that the Government may have in part ultimately received some benefit from the diversion of Imprest Fund monies.

"However, evidence, as has been exhibited in this case, tending to show that the perpetrator did benefit personally may be considered as evidence of the perpetrator's intent to permanently deprive the Imprest Fund of the use and benefit of the Imprest Fund monies.

"Thus, if you find beyond a reasonable doubt that Major Felix S. Satey directed the expenditure of Imprest Fund monies in an amount greater than $50.00 at Howard Lumber Company during the period 1 July 1960 to 1 December 1961 for purposes other than that intended by Imprest Fund Regulations, with the intent to permanently deprive the Imprest Fund of the use and benefit of the Imprest Fund monies, and that such monies were in fact expended according to the direction of Major Satey, then you may find Major Satey guilty of Specification 3 of Charge I.

"These instructions, Gentlemen, apply in the same manner as to Specifications 4 through 8 of Charge I."

By notation on the above instruction it appears that the Government relied solely upon the authority of United States v Miles, 11 USCMA 622, 29 CMR 438, and United States v Pitts, 12 USCMA 106, 30 CMR 106. In his post-trial review, the staff judge advocate placed his approval of the instructions solely upon the same two cases. In its opinion, the board of review affirmed the instruction in major reliance upon the identical cases, and cited paragraph 200a(2), Manual for Courts-Martial, United States, 1951, which states:

". . . A withholding may arise . . . as a result of devoting property to a use not authorized by its owner. . . ."

Taking this clause out of context to denote that such alone would constitute "withholding" within Article 121 is not justified. Rather, this clause must be read in connection with all other elements of larceny and presupposes the existence of all of them. Moreover, a Manual provision incorporating or eliminating a provision of substantive law would not be binding. United States v Smith, 13 USCMA 105, 32 CMR 105.

The board of review also cited, without comment, State v Pratt, 114 Kan 660, 220 Pac 505 (1923); Mitchell Grain and Supply Company v Maryland Casualty Company of Baltimore, Md., 108 Kan 379, 195 Pac 978 (1921); and State v Meininger, 303 Mo 675, 268 SW 71 (1925). We have examined each of those cases and find nothing therein which would sustain the instruction above quoted. Those cases involved, variously, an officer of a building and loan association who converted to his own use Government bonds and a bank deposit of the association, which monies were not used for the benefit of the association; a civil suit by an employer against the surety on an employee's bond protecting the employer against defalcation; and a situation in which a bank cashier gave bank funds to a third party but reaped no personal gain, and the bank received no use or benefit of the money. The holdings therein merely rejected as defenses the intent to make restitution or the absence of personal benefit to the defendant; and distinguished from criminal prosecutions the standard of proof in a civil action on a bond, where proof of embezzlement "with technical accuracy" is not required. We consider those decisions inapposite in light of the facts of the case at bar.

In its brief before this Court, the Government relies on no more than paragraph 200a(2), Manual, supra, and *Miles* and *Pitts,* both supra. We must therefore determine whether anything in either of those cases will support the broad and sweeping instruction requested by the Government, given by the law officer, and herein quoted. Initially we note that in each of those cases there is a separate opinion by

104

each of the three judges then constituting this Court. We do not believe it to be possible to read all three of such opinions and find sufficient common ground of any two judges to the extent that either of those cases could be regarded as enunciating any proposition of law. We consider them further to determine whether either of them can be regarded as authority for the instruction given in the instant case.

In United States v Miles, supra, this Court was considering an assignment concerning the providence of the appellant's plea of guilty. He was arraigned on specifications charging housebreaking, wrongful appropriation of Government property, and larceny of Government property. After findings defense counsel presented evidence which tended to show that, "all of the property taken by the accused in his housebreakings was brought by the accused to his company supply room to make up inventory shortages which worried the company commander. It may further be inferred from the evidence that the accused had been told by the company commander to try to make up the shortage of specified items by 'normal scrounging' activities." Miles, supra, at page 624.

In denying the claim that the plea was improvident, Chief Judge Quinn stated at page 625:

". . . As far as the property taken over by the accused's unit is concerned, the argument disregards the fact that, by his plea, the accused admitted, and has never since denied, he committed the unauthorized housebreakings, and that at the times thereof he intended to appropriate the property for his own purposes. There is no evidence in the record of trial or in the appellate papers before us which in any way suggests that the plea of guilty was improvident."

In so holding, the Chief Judge decided only the question of the providence of that plea. In United States v Walter, 16 USCMA 30, 36 CMR 186, we said:

"At the outset, we note that, in order to render a plea of guilty improvident, it is not sufficient to find the stipulated facts do not establish the guilt of the accused. They must conflict with his plea, and show his judicial confession is inconsistent with what the parties to the trial have freely agreed to constitute the occurrences giving rise to the charge. United States v Cassey, 14 USCMA 558, 34 CMR 338; United States v Thompson, 13 USCMA 395, 32 CMR 395."

See also United States v Hinton, 8 USCMA 39, 23 CMR 263.

In marked contrast, the separate opinion of Judge Latimer, while concurring with the Chief Judge, placed that concurrence on the view that conceding all that was tendered by evidence after findings, the appellant was guilty of the offenses with which charged. At least some of these conclusions were not espoused by the Chief Judge.

In Miles, supra, Judge Ferguson in a very strong dissent, disagreed totally with the Chief Judge and Judge Latimer and held the plea to be improvident; and noted that the appellant was ordered to remove Government-owned property from one Government building and to deliver it to another Government building for the use of the same Government. He therefore favored reversing and dismissing the charge involved.

There is no authoritative holding in United States v Miles, supra, to support the instruction given.

In United States v Pitts, supra, this Court was considering the single assignment of error as to whether the appellant, at his trial, was entitled to a sua sponte instruction on mistake. Here, again, there are three separate opinions by the judges then constituting the Court, and they vary widely in their views. In Pitts, rather than "scrounging" as in Miles, the Navy custom of "cumshaw" was involved. The appellant in that case was a Navy steward who was apprehended leaving his base with a quantity of Government-owned meat. The appellant tes-

tified the meat was to have been delivered as a part of a "cumshaw deal" in exchange for other items he had obtained for use in his galley. He explained he had undertaken this method to acquire those items because they were unavailable through his unit supply channels due to lack of funds. He stated he did not think he was doing anything wrong in arranging such an exchange of meat for other supplies, since, until consumed, the supplies belonged to the Government.

Judge Latimer, in his separate opinion, held, "The alleged custom upon which accused bases his appeal before this Court unquestionably amounts to larceny. See United States v Miles, 11 USCMA 622, 29 CMR 438." It is interesting to note, as we have stated, that only Judge Latimer expressed this view in *Miles*. After reviewing the facts and commenting on the long service of the appellant, Judge Latimer concluded:

". . . With that experience and in the light of this record, no reasonable person could conclude the accused took the foodstuff under an honest belief that he was rightfully converting rations to the Government's ultimate benefit.

"Accordingly, I conclude no issue of mistake was raised reasonably by the evidence. . . ." [United States v Pitts, supra, at page 109.]

In *Pitts* Chief Judge Quinn, concurring in the result, stated, in part:

"Assuming the practice of informal exchange or barter of items of supply between different units of the same service for military use negatives the existence of the specific criminal intent required to support a conviction for larceny (see United States v Miles, 11 USCMA 622, 29 CMR 438), the fact of the matter is that the accused here did not say the meat he took was intended exclusively for that purpose."

The Chief Judge then narrated evidence of personal use the appellant intended to make of the meat and concluded:

". . . His testimony, therefore, raises no issue of honest mistake; and, in fact, it constitutes a judicial confession of larceny." [Again citing *Miles*, supra.]

Judge Ferguson again dissented in *Pitts* and took very strong issue with his brothers in their holding that mistake was not reasonably raised, saying, at page 110:

". . . At the trial, he declared he was unaware that his participation in this 'cumshaw deal' involved any wrongdoing and that he believed he was authorized to engage in such transactions in order to procure supplies not otherwise available. Other witnesses testified to the existence of this 'swapping' process in the Navy and stated it was customarily employed to avoid supply deficiencies.

"In my opinion, the foregoing evidence places in issue the question whether the accused operated under an honest and material mistake at the time he took the meat in question from his galley."

Thus, again in *Pitts* each of the three judges expressed widely varying views of the law and no two of them agreed in the area with which we are concerned. We have a situation in which one judge wrote his opinion in the case, another did not agree therewith but concurred in the result attained, while the third judge agreed with neither of his brothers. We would, indeed, be making law if we should hold any one of the three opinions constituted the view of the Court.

All must agree that United States v Miles and United States v Pitts, both supra, constitute *ad hoc* decisions by a sharply divided court that did no more than deny the claim that a plea of guilty was improvident in one case, and that the defense of mistake was reasonably raised in the other. No principle of law is enunciated in either case.

Practically from its beginning, this Court has accentuated the existence and importance of intent in charges laid under Article 121, Uniform Code

of Military Justice, 10 USC § 921. Thus, in the early case of United States v Norris, 2 USCMA 236, 239–40, 8 CMR 36, it was stated:

"We are persuaded, as apparently the drafters of the Manual were, that Congress has, in Article 121, covered the entire field of criminal conversion for military law. We are not disposed to add a third conversion offense to those specifically defined. It follows that there is no offense known as 'wrongful taking' requiring no element of specific intent, embraced by Article 134 of the Code."

The element of intent under Article 121 was emphasized and stated in more detail in United States v Hayes, 8 USCMA 627, 25 CMR 131, as follows:

"Not every wrongful taking constitutes a violation of Article 121. See United States v Norris, 2 USCMA 236, 8 CMR 36. The intent to deprive the owner of his property, either permanently or temporarily, must include a *mens rea*. Therefore, the mere 'borrowing' of an article of property without the prior consent of the owner does not make out either of the offenses defined in Article 121. Something more is required, and that something is criminal intention. Thus, if one visits the office of a friend, and, finding him absent, takes a book which he has come to borrow, leaves a note to that effect, and returns the book the next day, there is no intent to steal or misappropriate the book and, necessarily, no violation of Article 121. According to the evidence, under proper instructions the court-martial here could have acquitted the accused because of the absence of any criminal intent. Consequently, the instructions were legally insufficient."

In United States v Thornton, 8 USCMA 446, 449, 24 CMR 256, we stated:

"In reviewing the case, the board of review held that the 'major factual issue' was the accused's explanation of his actions. Nevertheless, it concluded that the witness' testimony was immaterial. On that point we reach a different conclusion. Under the evidence, the court-martial could have found that the accused honestly believed he was entitled to be paid for the services he performed in accordance with the adopted plan, or, in the alternative, that he was honestly mistaken about his commanding officer's authority to authorize the plan for payment of compensation. If the court-martial so found, it would have been duty-bound to acquit the accused of larceny because of the absence of the required criminal intent."

The importance of intent is emphasized by Mr. Justice Jackson in Morissette v United States, 342 US 246, 274, 96 L ed 288, 72 S Ct 240 (1952), in the following language:

"Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. State court authorities cited to the effect that intent is relevant in larcenous crimes are equally emphatic and uniform that it is a jury issue. The settled practice and its reason are well stated by Judge Andrews in People v Flack, 125 NY 324, 334, 26 NE 267, 11 LRA 807:

'It is alike the general rule of law and the dictate of natural justice that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the

**107**

province of the other without destroying the significance of trial by court and jury. . . .'"

In the case at bar, the law officer gave a correct instruction on intent. In the next ensuing paragraph of his instruction, he included, as his own, the instruction requested by the Government and above-quoted. Therein he stated:

"You are advised that an intentional diversion of Imprest Fund monies for purposes other than that intended by Imprest Fund Regulations is larceny if the perpetrator intended permanently to deprive the Imprest Fund of the use and benefit of the Imprest Fund monies. It is not necessary for conviction of larceny that the perpetrator benefit personally or actually receive the monies, nor is it a defense that the Government may have in part ultimately received some benefit from the diversion of Imprest Fund monies."

This language emasculated, if it did not nullify, the immediately preceding correct instruction on intent.

It seems self-evident that this language quite effectively eliminated specific intent from some of the necessary elements of larceny. That language told the court-martial quite plainly that the expenditure of Imprest Fund monies in violation of Imprest Fund Regulations constitutes larceny. That is not the law. Chief Judge Quinn so stated in a minimum of language in United States v Sluss, 14 USCMA 388, 391, 34 CMR 168:

". . . Even if the evidence as to standing operating procedure be construed as a directive against removal, the evidence, in a light most favorable to the Government, still shows no more than a violation of an order. *Violation of an order or regulation is not a violation of Article 121.*" [Emphasis supplied.]

While it is true an accused need not in every case personally benefit from the conversion of funds, it remains true that he must intend permanently to deprive or defraud another person of the use and benefit of the property, or to appropriate the same to his own use or the use of any person other than the true owner. This element of intent is eliminated by the last-quoted instruction. The Imprest Fund monies were the property of the Government and appellant was charged with having appropriated Government money, but this instruction renders him guilty even though the Government received the entire benefit from the use of the monies.

Immediately following the above-quoted instruction requested by the Government, the law officer instructed on mistake. There is more than a fair risk that the quoted instruction very seriously militated against the appellant in connection with his defense of mistake.

Violation of a regulation under Article 92, Uniform Code of Military Justice, 10 USC § 892, is a serious offense, and is not to be condoned. Still, one who violates a regulation is not to be branded as a thief of Government property. This would be the necessary result if we should permit the above instruction to stand as military law.

While civilians, the judges of this Court are not ignorant of many commonplace procedures and practices within the military in the day-to-day fiscal operation of posts and stations. Should this instruction be held to be a correct statement of the law, we may be seriously reflecting on many distinguished officers of the military services who are, in their positions, responsible for making judgments as to the proper fund to which certain expenditures should be charged, and who, in their zeal for efficient and effective discharge of their duties, may overstep the technical limits of inflexible regulations. However, as will subsequently appear herein, this appellant is not only a violator of a regulation.

We should point out that there is a very material difference between Article 121, Uniform Code of Military Justice, supra, and Section 641, Title

**108**

18, United States Code. The latter section relates solely to the unlawful conversion of Government property and extends to "whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another" any Government property. As pointed out in Morissette v United States, supra, while this section is a codification of several previously existing sections of Title 18, it also creates a new offense extending to anyone "who knowingly converts" Government property. There is an indication in *Morissette*, possibly dicta, at page 271, that:

". . . Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with . . . the custodian's own, if he was under a duty to keep it separate and intact."

The appellant, however, was not prosecuted under Section 641, Title 18, United States Code, but under Article 121, Uniform Code of Military Justice, which is more akin to Section 661, Title 18, United States Code. Neither of the latter two provisions includes "knowingly converts." See United States v Norris, supra. Nor are we here concerned with the possible application of Article 108, Uniform Code of Military Justice, 10 USC § 908.

It follows that the decision of the board of review affirming appellant's conviction of specifications 2, 3, 4, and 7 of Charge I must be reversed.

We now proceed to the consideration of appellant's conviction of specification 5 of Charge I. The allegation of this specification is that appellant did, at C. K. Fields Marine Service, steal $942.71, United States currency, property of the United States.

All of the evidence relating to this specification shows that this was an isolated transaction in which the appellant secured a boat, motor, trailer, and safety equipment out of Imprest Fund monies. There was no other property involved and nothing could have, or did, go to the use of the Government. Appellant admitted the securing of these items but contended that he paid for the same in cash and secured an invoice therefor. All of the evidence of both sides as to this transaction was developed and the instructions of the law officer correctly submitted the law with reference to the specification. This transaction is so thoroughly segregated from those other specifications above considered that there is no fair risk that any of the improprieties we found in other specifications could have affected appellant's standing before the court on this specification. The issue before the court-martial was quite simple. Both sides agreed that appellant received the boat, motor, trailer, and safety equipment from C. K. Fields Marine Service and agreed that they were paid for in cash. Appellant contended it was paid by him out of his own funds in cash. The Government contended they were paid for out of Imprest Fund monies paid to C. K. Fields Marine Service by a sergeant working under appellant's direction. Only an issue of fact was tendered; the same was submitted to the court-martial under adequate instructions, and it found against appellant's contention. This finding, based upon adequate evidence, will not be disturbed.

The decision of the board of review therefore, upholding the conviction of appellant of specification 5 of Charge I, must be affirmed.

We now proceed to the consideration of the conviction of appellant of specification 1 of Charge I in which the appellant was charged with having stolen at Fort Gordon, Georgia, walnut lumber, of a value of about $54.72, the property of the United States Government. The allegation and proof as to this transaction shows that it had no connection with the alleged course of conduct of the appellant involving the

Imprest Fund, and is totally separate therefrom. It was shown that appellant caused walnut lumber to be taken from the stock at Fort Gordon to the home of a cabinet maker employed at the post and appellant directed such employee to construct an elaborate gun cabinet therefrom. Upon completion of the cabinet, appellant caused it to be crated and shipped to a general officer formerly stationed at Fort Gordon. The general retained the cabinet for a very protracted period of time and reshipped it to Fort Gordon, after the investigation of appellant's activities was begun. Appellant's defense as to this specification was alibi, contending that at the time the walnut lumber was taken from the stock at Fort Gordon he was on leave and had gone by boat on a trip through the Intra-Coastal Canal. The Government countered this claim by producing the log at a lock on the Canal showing that appellant's boat passed through that lock at a date later than appellant claimed and at a time subsequent to the taking of the walnut lumber. The law officer instructed correctly on the defense of alibi. The court-martial, on the facts, rejected appellant's contention.

Hence, the decision of the board of review upholding the conviction of appellant of specification 1 of Charge I must be affirmed.

What we have said and the actions we have taken renders unnecessary specific consideration of a number of the other assignments of error, since we have reversed the convictions affected by those assignments.

We do, however, deem it appropriate to comment briefly on certain other issues. One involves the action of the law officer in denying appellant's motion for appropriate relief and to make the allegations of specifications 1 and 3 through 8 more definite and certain. Appellant was acquitted of specifications 6 and 8 of Charge I, and we have reversed his conviction of specifications 2, 3, 4 and 7. We have affirmed only as to specifications 1 and 5 of Charge I.

We are inclined to the view that,

under the particular circumstances of this case, serious doubt exists as to whether appellant's motion for appropriate relief should not have been granted as to all but specifications 1 and 5 of Charge I. Those two counts relate, respectively, to the larceny of walnut lumber, and to the acquisition of the boat, motor, trailer, and safety equipment. The first specification was clearly adequate and complete. Appellant was fairly apprised of the crime against which he had to defend, and protected against further prosecution for the same offense. The same is true as to the fifth specification. As to the latter offense the evidence showed this count, unlike the others involving the Imprest Fund, to be an isolated and independent transaction.

In the event of a rehearing on the counts as to which we reverse, and should a motion to make more definite and certain be submitted, the law officer may, of course, pass upon the merits thereof. However, it appears as if the complete development of the evidence in the former trial may render such relief unnecessary. See Leahy v State, 111 Tex Crim 570, 13 SW2d 874 (1928).

Also, we mention an assignment of error which complains of the receipt of evidence of misconduct not charged and of which appellant had not been convicted. The alleged misconduct went no further than failure of appellant to file income tax returns, and evidence of a bad debt at the Howard Lumber Company which was involved in a specification the conviction for which we have reversed. In view of the overwhelming nature of the evidence of guilt as to the two specifications we have affirmed, there is no fair risk that appellant was prejudiced as to those two specifications. In connection with this matter, we note the staff judge advocate, in his post-trial review, stated that at the time of the trial of this case the opinion of this Court in United States v Robertson, 14 USCMA 328, 34 CMR 108, had not been received at Fort Gordon. In the event this issue were to arise at a pos-

sible rehearing, the decision in *Robertson* will, of course, be considered.

Finally, the assignment of error bringing forward a claim of cumulative error is overruled.

In light of the views set forth hereinbefore, the appellant's conviction of specifications 1 and 5 of Charge I is affirmed. The findings of guilty as to specifications 2, 3, 4, and 7, however, cannot stand, and the decision of the board of review with reference thereto is reversed. The record will be returned to The Judge Advocate General of the Army. A rehearing on the four specifications here set aside, and the penalty, may be ordered. Otherwise, the board of review may reassess an appropriate sentence on specifications 1 and 5 of Charge I, which we affirm.

Chief Judge QUINN and Judge FERGUSON concur.