UNITED STATES, Appellee

v.

GEORGE A. McCOY, Private First Class, U. S. Marine Corps, Appellant

5 USCMA 246, 17 CMR 246

No. 4762

Decided December 3, 1954

CAPT Melvyn H. Kerr, USMC, for Appellant.

CDR Raymond W. Glasgow, USN, and MAJ James A. Turley, USMCR, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

When tried before a Marine Corps special court-martial convened at Camp Nara, Japan, McCoy pleaded, and was found, guilty under a specification alleging the wrongful appropriation of "a wallet with contents, including Military Payment Certificates, of a value of about one hundred and twenty dollars ($120.00)," in violation of the Uniform Code of Military Justice, Article 121, 50 USC § 715. He was sentenced to receive a bad-conduct discharge, to be confined at hard labor for six months, to forfeit $30.00 of his pay per month for six months, and to be reduced to the grade of private. In considering the record in this case, the staff legal officer stated:

"In view of the accused's unrebutted testimony that he kept the wallet as more or less of a joke, which, if it were not true, could have been rebutted by the prosecution, and in view of his lack of prior convictions it is considered that the ends of justice would be best served by restoring the accused to duty at termination of the period of confinement adjudged."

The officer exercising general court-martial jurisdiction accepted the views of his legal officer, and suspended the execution of the punitive discharge. Later a board of review affirmed the findings, but reduced somewhat the period of confinement and forfeitures.

## II

The issue posed for this Court is one of whether the statement made by the accused after findings—that adverted to above by the staff legal officer—was so inconsistent with his plea of guilty to wrongful appropriation that the plea should have been withdrawn, and evidence received bearing on the offense charged. See Uniform Code, supra, Article 45(a), 50 USC § 620; Manual for Courts-Martial, United States, 1951, paragraph 70b. In connection with this contention, it may be observed that there are items in the sworn testimony of the accused—set out in the margin—which suggest that the staff legal officer may have been excessively charitable in treating the former's story as truthful and honest.[1] Perhaps the obvious inconsistencies in the testimonial statement of McCoy

[1] "ACCUSED: Sir, I just came from working in the laundry Saturday morning and I was sitting on my rack about 0630 and I saw this wallet so I picked up the wallet and made the statement that I had found the wallet, and I also said that I bet this is Pfc Nickerson's wallet. There was no identification card, and we were looking at the pictures, when I pulled out the man's social security card and it belonged to Pfc Lindquist. There was money in the wallet, I did not pull it out and count it, I just looked at it. I told Burch that I would like to keep the wallet for a week and teach the man a lesson. I then put the wallet under my pillow. Pfc Lindquist came in and questioned me, whether I had seen the wallet. I told him that I hadn't and he made a search under his pillow and his blankets and then made the statement that he would like to have the money back, but more so the wallet. He then left and I went to sleep. I didn't know at the time it was against the law. When I woke up I went over to the gym and the gym was closed, so on the way back I saw a working party and some boxes on a truck, so I figured I'd put the wallet on the boxes and someone would find it and turn it in. When I was in the room I could have left the wallet on the bench, but I was the only one in there, the rest of the crew was outside and it would look suspicious so I waited and put the wallet on the boxes then returned to the barracks and went to chow. After chow I went to the gym and played basketball. When I finished

**247**

serve to explain why trial counsel did not bestir himself to cross-examine him, much less to offer refuting evidence, if available—and why the court returned a sentence which was markedly disproportionate to any interpretation of the accused's conduct as "more or less a joke."

Accepting fully, however, the veracity of McCoy's testimony, we find nothing in the record which would require the withdrawal by the court of his plea of guilty. Unlike the typical case of wrongful appropriation, the accused—according to his own account—did not wrongfully "take" the wallet and its contents from the owner. However, he did "withhold" it—which under Article 121 is regarded as possessing the same effect. See United States v. Krawczyk, 4 USCMA 255, 15 CMR 255.

His testimony does not at all negate the wrongfulness of the act charged against him. The claim by the accused that he was merely seeking to "teach . . . [the owner] a lesson" constitutes no sort of justification—for neither precedent nor social policy has been called to our attention which favors this type of "instruction." Indeed, the harmful consequences which might well result from according judicial approbation to this "educational" technique are portended by the very circumstance that here the owner ultimately lost his wallet—although he was fortunate enough to regain the contents thereof.

Of course, one who finds a lost item is entitled to a reasonable amount of leeway in the manner and time of returning the property to its rightful owner. He is not required to put aside his normal concerns in order that he may return the property to the loser instanter. Nor is it demanded that he publish a newspaper or other advertisement at his own expense for the purpose of locating the owner. Instead, he may simply deliver the property to police or other appropriate authorities for further action—and with a right that it be returned to him if the loser cannot be discovered. These principles, however, have nothing whatever to do with the present case—for here the owner of the wallet, a fellow serviceman, was known to the accused, and had actually conversed with him after the latter had taken possession of the wallet. Yet the property was not returned, nor was its discovery revealed.

In United States v. Krull, 3 USCMA 129, 11 CMR 129, we held that an officer was liable for larceny of groceries "borrowed" from an enlisted mess under circumstances indicating an intention not to return the identical goods. In United States v. Krawczyk, supra, we concluded that, as a matter of law, larceny was committed by an accused person who, without claim of authorization of any sort, took and expended money with which he had been entrusted—this despite an alleged intention to repay the sum taken. These cases are applicable in no strict and direct sense to the case at bar—since the present situation involves no assertion of an intention permanently to deprive the owner of his goods. However, as represented

---

I went back to see if the wallet was still there and it was gone. When I went back to the barracks, they were having a shake down, so I went back to the gym and went into this empty room there was nothing there but a fifty gallon drum. There were some boards loose near the ceiling and I got up on the drum and put the money in there. I came down from there and went back to the barracks and I saw Lindquist and he told me that he had found his wallet but had not found the money. I knew that he didn't have the money but I did not know about the wallet. When I got upstairs they were having a shake down. After that was over I went to chow and was on my way to the movies when Pfc Burch came up and asked me if I had the money and I said that I had. He told me that if I got caught with it, it would be a court-martial offense, a General court-martial offense, that is what he said, and I told him that I would turn it back to the man, then he left. Captain Pearce then called me into his office and the captain told me about Article 31, and asked me where the money and wallet was located. Then we went over to the gym and got the money. I told the captain where I had left the wallet, but at this time the wallet was missing. I am sorry it happened I didn't think I was committing a crime, but felt it as more or less a joke."

by these cases, the policy of military law to protect the owner of property to the utmost is very much to the point. Moreover, the Krull case seems to repudiate for the military establishment any element of the outmoded concept of *lucri causa*—that is, the notion that, to be guilty of larceny, one taking another's goods must have had in mind some gain to himself. See especially the concurring opinion.

Indeed, if the evidence given by Lieutenant Krull and by Mr. Krawczyk —whose testimonial accounts a majority of this Court deemed to constitute judicial confessions of larceny—had been accepted at face value, each of these accused persons might be regarded as less culpable in some respects than the present accused. At least, it may be said that each of them alleged the existence of some sort of need—some necessity for his action. And, if Krull's testimony be regarded as true, there was little risk of loss ultimately resulting to the owner of the purloined grocery items. Here, on the other hand, the accused's act held but slight prospect of producing good for anyone, and it certainly extended the discomfort of the disturbed owner of the wallet.[2]

The accused, according to his own testimony, proposed to retain possession of the wallet for a week—a not inconsiderable period of time. In addition, he took a series of quite positive and deliberate steps with respect to the wallet and the currency it contained— of none of which he could possibly have supposed the owner would approve. What psychological "gain" he received from his misconduct, we cannot know— but it is plain that the owner of the goods suffered a legally cognizable harm or injury, in that he lost the use of that property. Under the circumstances of the present case, this is all that is required to sustain findings of guilty to a charge of wrongful appropriation.

### III

No inconsistency has been detected between the plea of guilty to wrongful appropriation, on the one hand, and the accused's post-findings statement in mitigation and extenuation, on the other. Thus the findings of guilty must be affirmed.

Judge LATIMER concurs.

Chief Judge QUINN concurs in the result.

---

[2] If the law were as the accused believes it to be, he would go scot-free for all his "joke." On the other hand, one like Hugo's Jean Valjean, who took bread to feed a starving family, might be prosecuted successfully for larceny. Cf. Burdick, Law of Crime, 1946 ed, § 551, page 321.