UNITED STATES, Appellee

v.

Mark W. McGOWAN, Lance Corporal
U.S. Marine Corps, Appellant.

No. 93–1281.
CMR No. 91 2995.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 12, 1994.

Decided Feb. 28, 1995.

For Appellant: *Commander M. T. Hall, JAGC, USN* (argued); *Lieutenant James A. Douglas, JAGC,* USNR (on brief).

For Appellee: *Lieutenant Brian B. Rippel, JAGC, USNR* (argued); *Colonel T. G. Hess, USMC, Commander S. A. Stallings, JAGC, USN, Lieutenant D. K. Herlihy, JAGC, USNR* (on brief); *Colonel J. Composto, USMC and Captain Brett D. Barkey,* USMC.

## Opinion

SULLIVAN, Chief Judge.

1. On April 30, 1991, appellant was tried by a special court-martial composed of a military judge sitting alone at Headquarters, 2d Force Service Support Group, Al Jubail, Kingdom of Saudi Arabia. He pleaded guilty to and was found guilty of wrongfully appropriating a M998 High Mobility Multi–Purpose Wheeled Vehicle (HMMWV) and stealing a .45 caliber pistol, military property of the United States, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to a bad-conduct discharge, confinement for 75 days, and reduction to E–1. On October 4, 1991, the special court-martial convening authority in this case—Commander, 8th Motor Transport Battalion, 2d Force Service Support Group, Fleet Marine Force, Atlantic, Camp Le-Jeune, North Carolina—approved the sentence. On March 31, 1993, the Court of Military Review[1] set aside the finding of guilty to larceny of a military pistol but approved the findings of guilty to wrongful appropriation of the military vehicle. It then approved a reduced sentence of no punishment, after noting that the Naval Clemency and Parole Board had remitted the discharge in February 1992.

2. On February 2, 1994, this Court granted these two issues raised by appellate defense counsel:

I

WHETHER APPELLANT'S PLEA OF GUILTY TO WRONGFUL APPROPRIATION OF A MILITARY VEHICLE WAS IMPROVIDENT.

---

1. *See* 41 MJ 213, 229 n. * (1994).

## II

WHETHER THE DEPUTY JUDGE ADVOCATE GENERAL FOR MILITARY JUSTICE'S PARTICIPATION IN THE PREPARATION OF THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW JUDGES' FITNESS REPORTS DEPRIVE THAT COURT OF ITS INDEPENDENCE AND THE APPEARANCE OF INDEPENDENCE.

Issue II has been resolved in the Government's favor by the decision of this Court in *United States v. Mitchell*, 39 MJ 131, *cert. denied*, ––– U.S. –––, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994). As for Issue I, we hold in appellant's favor and conclude, based on the particular record before us, that his pleas of guilty to wrongful appropriation of a military vehicle were improvident. *United States v. Sluss*, 14 USCMA 388, 34 CMR 168 (1964); *see United States v. Satey*, 16 USCMA 100, 36 CMR 256 (1966).

3. Appellant was charged with larceny of a military vehicle during the Persian Gulf War. That specification states:

Specification 1: In that [appellant] did, at Al Jubail, Kingdom of Saudi Arabia, on or about 14 March 1991, steal one M998 High Mobility Multi–Purpose Wheeled Vehicle (HMMWV), of a value of about $20,000.00, military property of the United States.

He pleaded guilty with exceptions and substitutions to "wrongfully appropriat[ing]" this same military vehicle.

4. The record reflects appellant's discussion with the military judge concerning these pleas of guilty as follows:

MJ: Would you tell me now in your own words how, if at all, you committed the violation in Specification 1, that is to the lesser included offense of wrongful appropriation?

ACC: On or about that time, sir, I saw a vehicle that was broke down. At that time, *I had the Navy SEABEES help me fix the vehicle, and we used it at Fleet Hospital 5 for use to medevac patients and to get gear for the patients at the hospital.*

MJ: Now, you say on or about that time. Are you referring to on or about 1 March 1991?

ACC: Yes, sir.

MJ: You saw a vehicle that was disabled?

ACC: Yes, sir.

MJ: And what was the location of the vehicle? Let me make it simpler for you; was this at Al Jubail, Kingdom of Saudi Arabia?

ACC: Yes, sir.

MJ: The vehicle was disabled; you enlisted the aid of Navy SEABEES to fix the vehicle?

ACC: Yes, sir.

MJ: They succeeded in doing so and you used the vehicle to move patients?

ACC: Yes, sir.

MJ: All right. And where were these patients being moved from?

ACC: From the various units in the area, sir, to and or from Fleet Hospital 5 to Fleet Hospital 15 and the Marine Corps Hospital, sir.

MJ: Was the vehicle in any way altered in order to condition it for such use, that is, the movement of patients?

ACC: Yes, sir. We had a soft—it came with no doors or cover. For the use of patients we had to put—I had to get a roof and doors to put on the vehicle so they could put stretchers in the back of the vehicle, sir. I had the vehicle painted and I used—at the time when I found the vehicle, the engine was blown and all the TAC numbers and TAM plates had been taken off, so I had no idea what the number was, sir, and I used the TAC numbers from my LVS that currently was in use in Saudi Arabia at CSSD–26, sir.

MJ: All right. Run that by me again, I didn't hear the last part. I guess I heard it; I didn't understand it.

ACC: I drove an LVS up north, sir, and the TAC numbers on the truck were non-present; there was no numbers on it; they had been taken off. I used the TAC number 551096 from my vehicle and put them on the HMMWV.

MJ: When you say your vehicle, what vehicle are you referring to?

ACC: The Logistic Vehicle Support [sic], LVS, sir.

MJ: Let's go through this step by step. You took this HMMWV, correct?

ACC: Yes, sir.

MJ: First of all, when you saw the HMMWV and realized that the engine was blown and the vehicle was disabled with these serial number plates removed, did you think that the vehicle had been abandoned?

ACC: No, sir.

MJ: Did you obtain anyone's authorization to remove the vehicle?

ACC: No, sir.

MJ: Did the Navy SEABEES somehow authorize you to remove the vehicle?

ACC: No, sir.

MJ: Were the Navy SEABEES with you when you saw the vehicle the first time?

ACC: No, sir. It had been sitting at the proximity for about five days to seven days.

MJ: So, as I understand it, this vehicle was modified to use it as an ambulance in effect, correct?

ACC: Correct. I put a soft top on it, sir.

MJ: But it was used as an ambulance to move patients to and fro?

ACC: Yes, sir.

MJ: Was there not another ambulance available?

ACC: Yes, sir.

MJ: To whom did this property belong, this HMMWV?

ACC: The United States Government, sir.

* * *

MJ: Where was the vehicle located, not specifically—Al Jubail—but where in or near Al Jubail?

ACC: Directly across the street from the hospital, sir, in a parking area designed for people to come visit patients.

MJ: Do you believe that your taking of the HMMWV was lawful, or was it wrongful?

ACC: It was wrongful, sir.

MJ: Why?

ACC: The vehicle was not mine, sir.

MJ: What did you intend to do with the HMMWV? You say you used it as an ambulance for a period of time.

ACC: Yes, sir, for the Marine Liaison, not so much for the hospital, sir.

MJ: All right. For the Marine Liaison. Was it your intention to keep the property permanently or only temporarily?

ACC: No, sir, just temporarily.

MJ: Would it be correct to say that you intended to return the property eventually?

ACC: Yes, sir.

MJ: Do you agree that you did wrongfully take the property even in view of the fact that you were using it for a beneficial purpose?

ACC: Yes, sir.

MJ: *And it was your intention merely to temporarily deprive the United States Government of the use and benefit of the property?*

ACC: *Yes, sir.*

MJ: *The question comes to mind, gentlemen, can an accused wrongfully appropriate property being used by one unit or agency of the United States Government in order to use it for the benefit of another unit or agency?*

DC: *I don't have it right at hand, sir, but I believe there is case law that is clear on the proposition. Basically, we have a supply system for a reason. For that reason, anybody who does this, appropriating an item or something out of the unit to which it is originally assigned for the benefit of a different unit might be mitigating, but it is no defense to the charge of theft or wrongful appropriation.*

MJ: *Would the Government agree?*

TC: *The Government would, sir.*

MJ: *I think that is a reasonable statement of the law. I can't cite you a case, but I think that that makes good sense in my mind.*

For what period of time was the property temporarily appropriated for the use

and benefit of these Marines—the Marine Liaison as you stated?

ACC: Excuse me, sir?

MJ: What was the length of time the property was temporarily being used by you for the Marine Liaison?

(The accused and counsel conferred out of the hearing of the court.)

ACC: A little over a month and a half, sir.

MJ: Does either counsel desire additional questions about the lesser included offense under Specification 1?

TC: No, sir.

DC: No, sir.

(Emphasis added.)

---

5. The particular question before this Court is whether appellant entered valid pleas of guilty to wrongful appropriation of a military vehicle in violation of Article 121. *See generally United States v. Hanson,* 24 MJ 377, 379 ¶ 11 (CMA 1987). Appellant asserts that his guilty-plea responses established facts legally inconsistent with the criminal intent required for conviction of wrongful appropriation. Final Brief at 3. We initially note that a guilty plea may be set aside by an appellate court only if "the record of trial show[s] a 'substantial basis,' in law and fact for questioning the guilty plea." *United States v. Prater,* 32 MJ 433, 436 ¶ 9 (CMA 1991). We further note that this Court will not engage in "[p]ost-trial speculation" concerning the factual basis for guilty pleas. *See United States v. Harrison,* 26 MJ 474, 476 ¶ 7 (CMA 1988).

6. Article 121 states in pertinent part:

§ 921. **Art. 121. Larceny and** *wrongful appropriation.*

(a) Any person subject to this chapter who *wrongfully takes,* obtains, or withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind—

* * *

(2) *with intent temporarily to deprive or defraud another person of the use and benefit of property* or to appropriate it to his own use or the use of any person other than the owner, is guilty of wrongful appropriation.

(Emphasis added.) This military offense is not new to military law, and it was originally proscribed by Congress to prevent "the wrongful temporary deprivation of government property furnished or intended for the armed forces." J. Snedeker, *Military Justice Under the Uniform Code* § 3507 at 860 (1953); *see* G. Davis, *A Treatise on the Military Law of the United States* 466 (3d ed. 1913 Revision) (to prevent uses of government property not authorized by Congress).

7. A "wrongful" taking in the context of Article 121 means a trespass on or interference with the possessory right of the owner or another with a superior interest in the property. *See United States v. Jones,* 35 MJ 143, 146 ¶ 9 (CMA 1992); *United States v. Fasnacht,* 35 CMR 508 (ABR 1964). The President in paragraph 46c(1)(d), Part IV, Manual for Courts-Martial, United States, 1984, has explained a wrongful taking as follows:

(d) *Wrongfulness of the taking, obtaining, or withholding.* The taking, obtaining, or withholding of the property must be wrongful. As a general rule, a taking or withholding of property from the possession of another is wrongful if done without the consent of the other, and an obtaining of property from the possession of another is wrongful if the obtaining is by false pretense. *However, such an act is not wrongful if it is authorized by law or apparently lawful superior orders, or, generally, if done by a person who has a right to the possession of the property either equal to or greater than the right of one from whose possession the property is taken, obtained, or withheld.* An owner of property who takes or withholds it from the possession of another, without the consent of the other, or who obtains it therefrom by false pretense, does so wrongfully if the other has a superior right—such as a lien—to possession of the property. A person who takes, obtains, or withholds property as the agent of another has the same rights and liabilities as does the prin-

cipal, but may not be charged with a guilty knowledge or intent of the principal which that person does not share.

In the context of government or military property, a wrongful taking of property is one that is not authorized by the Government or a unit thereof which has possession or lawful custody of that property. *See United States v. Miles,* 11 USCMA 622, 625, 29 CMR 438, 441 ¶ 5 (1960); *see also United States v. Faylor,* 8 USCMA 208, 24 CMR 18 (1957); *see generally United States v. Sneed,* 17 USCMA 451, 38 CMR 249 (1968).

■ 8. In the case at bar, appellant admitted that his removal of the HMMWV from the patient parking lot, his repair of it, and his subsequent use of it to aid wounded Marines was wrongful. He agreed that the HMMWV was not his property but was property of the United States. He further conceded that he did not have authorization to remove this vehicle. Finally, he acknowledged that he did not believe this vehicle was abandoned, even though it was disabled and its serial number plates were missing. Such conduct deprived the unit accountable for the HMMWV of its lawful right to possess it and, therefore, was wrongful within the meaning of Article 121. *See United States v. Miles,* 11 USCMA at 625, 29 CMR at 441 ¶ 5 (Quinn, C.J.), and 11 USCMA at 626, 29 CMR at 442 ¶ 10 (Latimer, J., concurring); *United States v. McCoy,* 5 USCMA 246, 17 CMR 246 (1954).

■ 9. Nevertheless, it is long established as a matter of military law that a wrongful taking alone does not constitute wrongful appropriation under Article 121. *United States v. Norris,* 2 USCMA 236, 8 CMR 36 (1953); *cf. Tibbs v. United States,* 507 A.2d 141, 143 ¶¶ 9–10 (D.C.App.1986). This military statute also requires that the wrongful taking be accompanied by an "*intent* temporarily to *deprive* or defraud another person *of the use and benefit of property* or to appropriate it to his own use or the use of any person other than the owner." Art. 121(a)(2) (emphasis added). This specific intent is in addition to the general intent required for a wrongful taking, *i.e., an intent to take possession of the property* from its owner or custodian. *See United States v. Sluss* and *United States v. Norris,* both *supra; see also United States v. Huggins,* 12 USCMA 686, 689, 31 CMR 272, 275 ¶ 10 (1962); *United States v. Bull,* 12 USCMA 514, 517, 31 CMR 100, 103 ¶ 11 (1961); *cf. Tibbs v. United States, supra.*

10. Colonel Winthrop, writing long ago, commented on the type of appropriation of government property which could be punished by court-martial:

**MISAPPROPRIATION.** The knowing and willful, (i.e. intentional,) misappropriation of public property, specified in Paragraph 9, may be defined to be the assuming to one's self, or assigning to another, of the ownership of such property, where the same is not entrusted to the party in a fiduciary capacity and the act is therefore not an embezzlement. Thus the offence is committed where an officer appropriates materials known by him to belong to the United States, or the labor of government employees, in erecting a building or constructing a carriage which is to be his own property. *The appropriation, however, need not be for the party's own benefit, but may be resorted to for a friend or for the accommodation of a person interested with the officer in some business, &c.*

**MISAPPLICATION.** This offence is, strictly, distinguishable from the last in that it is properly an appropriation not of the *ownership* \* of the property *but of its use* \*, *and that, by the terms of the paragraph, it must be an appropriation for the personal* \* "*benefit*" *of the offender;* as where an officer or soldier makes use without authority of animals, vehicles, tools, &c., of the government—whether or not specially entrusted to his charge—*for the purposes of himself or his family.*

***WRONGFUL SALE OR DISPOSITION.*** Under this designation are included sales, &c., such as are made punishable by Arts. 16 and 17, as also any other unauthorized sale, or any unauthorized pledge, barter, exchange, loan, or gift, of public property. The general and comprehensive term "*wrongful* \* *disposition*" \* includes also any appropriation or application of such property not embraced within

the previous descriptions of offences in this Paragraph. *Thus it would include unauthorized applications of the possession or use of the property not for the private purposes of the offender; as, for example, the loaning by an officer or soldier to a civilian, (for his benefit exclusively,) of stores, tools, materials, &c, of the United States, with the understanding that the same were to be returned.* All such dispositions of public property are of course radically illegal for the reason that no executive officer, but Congress only, is empowered under the Constitution, (Art. IV, Sec. 3 § 2,) to dispose of property of the United States.

This term, *wrongful * disposition,* however, like the designations of *misappropriation* * and *misapplication* * which precede, is, in practice, not always employed in a strict sense, and it would not be exceeding the privilege of military pleadings to charge as a "wrongful disposition," under this Article, any illegal appropriation, diversion, or employment, knowingly made, of money or other property of the United States, not clearly constituting a larceny or embezzlement.

*Defence, &c. While an accidental, or slight and temporary, application to personal use, or an unimportant though irregular disposition, of government property will not in general be made the subject of a military charge, such application, & c., where material and continued, especially where so conspicuous as to constitute an example prejudicial to the morale * or discipline of the command, may be a serious offence.* And the fact that the same is practiced generally in a command, or is sanctioned by the commanding officer, can-

not be accepted as a *defence* * to the charge, though, as a circumstance to be considered in adjusting the measure of punishment, it may properly be admitted in evidence.

W. Winthrop, *Military Law and Precedents* 708–09 (2d ed. 1920 Reprint) (footnotes omitted; emphasis except for words marked with * added).

▮▮▮ 11. Consistent with the military origins of this offense, this Court has been somewhat circumspect in determining whether an intent of a servicemember in a particular case is legally sufficient to satisfy the specific-intent element of this offense. *See United States v. Greenfeather,* 13 USCMA 151, 155, 32 CMR 151, 155 ¶¶ 16–18 (1962). A simple intent to interfere with lawful possession of the Government will not suffice where it is also shown that a servicemember intended the property to be used "*wholly*" for a "legitimate" government purpose. *See United States v. Sluss,* 14 USCMA at 391, 34 CMR at 171 ¶ 9 (emphasis added); *United States v. Satey, supra.* However, if the accused also intends to help his own military unit at the actual expense of another unit possessing the property, a sufficient criminal intent has been found to exist (as this is not wholly a government purpose). *See United States v. Kastner,* 17 MJ 11, 15 ¶ 9 (CMA 1983); *United States v. Miles, supra.* The bottom line, however, is clear: An accused must intend to deprive the Government or a unit thereof of more than mere possession of its property in order to be guilty of wrongful appropriation. *United States v. Sluss* and *United States v. Satey,* both *supra; United States v. Graham,* 13 CMR 727, 730 ¶ 12 (AFBR 1953).[2]

2. The Model Penal Code similarly approaches the requisite specific intent for the crime of theft as follows:

§ 223.0 **Definitions**
In this Article, unless a different meaning plainly is required:
(1) "deprive" means: (a) *to withhold property of another* permanently *or for so extended a period as to appropriate a major portion of its economic value,* or with intent to restore only upon payment of reward or other compensation; or (b) to dispose of the property so as to make it unlikely that the owner will recover it.

ALI *Model Penal Code and Commentaries* (hereinafter *Commentaries* ) (Part II) 124 (1980) (footnote omitted).
According to the Comment to Section 223.2:
Under the definition of "deprive" in Section 223.0(1), a conviction for theft would be possible in ....the case where the actor intends to return the property without exposing it to risk of loss in the meantime but also intends to withhold it "for so extended a period as to appropriate a major portion of its economic value." For example, a person would be guilty of theft under Subsection (1) if he surrepti-

■ 12. Turning to appellant's guilty-plea responses, we note that they established that he exclusively intended to and did, in fact, use this military vehicle to assist American war casualties in the Persian Gulf during Operation Desert Shield/Desert Storm. Moreover, there is no indication in his responses that he particularly intended to benefit himself or his unit in any way from this use of the military vehicle. *Cf. United States v. Miles,* 11 USCMA 622, 29 CMR 438 (1960) (intended to make up shortages of own unit's inventory);[3] *see generally United States v. Harrison, supra.* Finally, these responses clearly indicate that appellant recognized that this military vehicle in its disabled and effaced condition was of no apparent use to any other identifiable military unit. *Cf.*

*United States v. McCoy,* 5 USCMA at 248, 17 CMR at 248 ¶ 4 (recognized actual loss of use); *United States v. Meadow,* 14 MJ 1002 (ACMR 1982) (functional property clearly designated as being in custody of another military unit). In our view, these responses only show that appellant intended to deprive the custodial unit of simple possession of an inoperable military asset.[4] *See United States v. Satey* and *United States v. Sluss,* both *supra* at 408 ¶ 2.

■ 13. Admittedly, earlier in the providence inquiry, appellant acknowledged that he intended to temporarily deprive the United States of the use and benefit of the HMMWV. However, as noted above, his guilty-plea-inquiry responses establishing the

---

tiously "borrows" his neighbor's lawn mower for the summer, intending to return it in the fall when it would no longer be needed or useful. It would likewise be theft to take tires, a battery, radioactive substances, or other similar goods with a limited useful life, even though the actor intended to return the item taken after a prolonged use that substantially dissipated its value to the owner. *On the other hand, unauthorized borrowing or use of property is excluded from the offense where the period is not so extended as to appropriate a major portion of its economic value or in cases where the use or disposition of the property does not make it unlikely that the owner will recover its beneficial use.* Unauthorized use of automobiles and other vehicles is treated separately in Section 223.9.

*Commentaries, supra* at 174–75 (emphasis added).

3. We do not consider the various opinions of the Judges of this Court in *United States v. Miles,* 11 USCMA 622, 29 CMR 438 (1960), to be dispositive in appellant's case on the question of the specific intent required for conviction under Article 121, Uniform Code of Military Justice, 10 USC § 921. That case was contested, and appellant's professed security rationale was severely undermined by evidence of his private use of most of the military property he took. In addition, this Court later distinguished *Miles* in *United States v. Sluss,* 14 USCMA 388, 391, 34 CMR 168, 171 ¶ 9 (1964), where the military property was held for 5 months in a private vehicle for a wholly military purpose. Finally, this Court in *United States v. Satey,* 16 USCMA 100, 36 CMR 256 (1966), clearly indicated that *Miles* should be limited to its facts. A unanimous Court said:

All must agree that *United States v. Miles* and *United States v. Pitts,* [12 USCMA 106, 30 CMR 106 (1961)] both *supra,* constitute *ad hoc* * decisions by a sharply divided court *that did no*

*more than deny the claim that a plea of guilty was improvident in one case* [*Miles*] *and that the defense of mistake was reasonably raised in the other. No principle of law is enunciated in either case.*

16 USCMA at 106, 36 CMR at 262 ¶ 24 (emphasis added except for words marked with *).

4. It is a general rule of statutory construction that "[i]f the statute is clear and unambiguous, a court may not look beyond it but must give effect to its plain meaning, unless to do so would produce, 'absurd results,' or 'bring about a result completely at variance,' with the statutory purpose." *Tibbs v. United States,* 507 A.2d 141, 143–44 (D.C.App.1986) (citation omitted). It is simply inconceivable that Congress intended that Article 121 be applied in a martinet fashion to burden appellant with a Federal theft conviction for intending to help wounded soldiers in a war zone by repairing inoperable military property assigned on paper to some other unit. *See United States v. Sluss,* 14 USCMA at 391, 34 CMR at 171 ¶ 9 (record showed grounds for "censure for possible interference with other maintenance personnel" responsibilities but not "intent to deprive" Government of "benefit" of military property or intent "to appropriate it" to "use of another").

*See* W. Hopkins, *One Bugle No Drums: The Marines at Chosin Reservoir* 203 (1986), where it was stated:

Chesty Puller walked some distance behind the jeep, checking on abandoned vehicles. He insisted that we were going to take out everything that we came in with, if it would still move. Furthermore, he was going to bring all the stuff the Army had abandoned. He was astonished to find many vehicles with their keys in the ignition on the roadside. As a result, the 1st Marine Regiment acquired more jeeps and trucks than it could use.

facts of this case later show an actual intent which is legally insufficient to establish this element of this offense. *Cf. United States v. Smith,* 34 MJ 319, 324 ¶ 16 (CMA 1992). Such an inconsistency, based on the entire record, raises a substantial question in our minds concerning the providence of his pleas. *See United States v. Johnson,* 1 MJ 36, 39 ¶ 6 (CMA 1975). Accordingly, his pleas of guilty to wrongful appropriation cannot be sustained by this Court. *United States v. Prater, supra.*

14. This opinion in no way condones the practice of "midnight requisitioning" (*i.e.,* one unit taking equipment of another unit without authority). This case and its holdings are confined to the unique facts in this record. Here, we have the case of a hospitalized Marine who refused to be evacuated from a war zone and, on his own initiative and with direct assistance from the U.S. Government (U.S. Navy Seabees), converts an unidentifiable, inoperative military vehicle into a useful ambulance to transport wounded and sick Marines in time of war. He does not hide his purpose of openly transporting Marines to the hospital and, in fact, paints his own assigned vehicle's identification numbers on this ambulance, an act which would allow a clear tracing of this vehicle to himself as the assigned operator. He does not know to which unit the vehicle belongs and only learns that the vehicle was reported stolen when he is arrested for wrongful appropriation of the vehicle.

15. The record of trial further shows that the military judge in accepting appellant's guilty pleas questioned counsel whether a servicemember can be found guilty in the circumstances of this case. Defense counsel helpfully assures the judge that a crime has been committed ("I don't have it right at hand, sir, but I believe there is case law that is clear on the proposition. . . ."). At this point, the judge asks the prosecution, "Would the Government agree?" and received the answer, "The Government would, sir." The judge then concludes this summary but critical analysis of the criminality of the offense

by this conclusion: "I think that is a reasonable statement of the law. I can't cite you a case, but I think that makes good sense in my mind."

16. Our system of justice, before it can impose a permanent stain of dishonor in the form of a Federal felony conviction on this Marine, requires a legally sufficient record. In light of the precedents of this Court and in the interest of justice and fairness, we cannot say such a record exists in this case.[5]

17. Of course, since appellant pleaded guilty to the offense of wrongful appropriation, the prosecution was not required to present its full case to this court-martial with respect to appellant's intent or to his personal use of the HMMWV. Moreover, in view of our precedents, it is clear that appellant might still be prosecuted for an entirely intended governmental use of the HMMWV if it violated an applicable order or regulation. *See United States v. Sluss* and *United States v. Huggins,* both *supra* at 408 ¶ 2 and 411 ¶ 9. Accordingly, a rehearing is in order.

The decision of the United States Navy–Marine Corps Court of Military Review as to specification 1 and the Charge and the sentence is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing on that specification and on the sentence of no punishment may be ordered.

Judge WISS concurs.

COX, Judge (concurring in the result):

18. This is a strange case, both on its facts and on its appellate history. The United States Navy–Marine Corps Court of Military Review set aside appellant's guilty plea to larceny of a handgun, but approved his conviction of wrongful appropriation of the military vehicle as described by Chief Judge Sullivan. 41 MJ at 407 ¶ 1. Then, mysteriously, that court approved "no punishment."

---

5. With all due respect to the zealous dissent and its rigid support of the military supply system, I suggest that justice in a combat zone should focus on the right of a servicemember to receive fair treatment under the law rather than the protection of "sloppy discipline."

19. Judges Gierke and Crawford have, in my judgment, correctly analyzed the law, applied it to the facts, and concluded that, under these facts, appellant can lawfully be guilty of wrongful appropriation.

20. In that sense, I concur in Judge Gierke's view of the law of larceny. Nevertheless, I join Chief Judge Sullivan in the result reached, albeit for a different reason.

21. A guilty plea implies more that just an admission of legal guilt. By necessity, it must be an unfettered exercise of free will by an accused to give up his right to a trial, to put the Government to its proof, and the choice must be an informed one. *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *United States v. Care,* 18 USCMA 535, 40 CMR 247 (1969).

22. My concern is that appellant's choice was unduly influenced by the more significant larceny charge. In all likelihood, appellant's decision to plead guilty was motivated more by the totality of the charges, the choice of forum, and the futility of contesting the "wrongful appropriation" charge in the face of the other charge. *See United States v. Haye,* 29 MJ 213 (CMA 1989); *United States v. Hogan,* 20 MJ 71 (CMA 1985).

23. Accordingly, I join Chief Judge Sullivan in granting appellant a rehearing on the charge wherein the Government can attempt to prove the *mens rea* necessary to convict this Marine of a criminal offense. This is not clemency by definition; rather, it is an exercise of judicial discretion. If appellant is convicted upon a rehearing, he will receive the "no punishment" he richly deserves.

GIERKE, Judge, with whom CRAWFORD, Judge, joins (dissenting):

24. I acknowledge that judges at all levels can and should exercise judicial discretion. I have a different view, however, regarding how it should be applied in this case. Judicial discretion was exercised by the military judge when he accepted the accused's pleas of guilty. In my view, the manner in which we, as an appellate court, should exercise our judicial discretion is governed by standards of review. In this case the military judge's decision should be reviewed un-der an abuse-of-discretion standard. S. Childress & M. Davis, *Federal Standards of Review* § 8.03 at 8–12 to 8–13 (2d ed.1992). This standard does not allow us to substitute our judgment or discretion for that of the military judge but rather requires us to uphold the military judge's exercise of his authority unless we find that he acted arbitrarily, capriciously, or unreasonably.

25. Furthermore, we should conduct our appellate review based on the law and evidence of record, not "suspicion, conjecture, and speculation." *See United States v. Peterson,* 1 USCMA 317, 320, 3 CMR 51, 54 ¶ 7 (1952). In my view, any conclusion that appellant's pleas of guilty to wrongfully appropriating the vehicle was motivated by the charge of larceny of a pistol is speculation. Appellant, represented by presumptively competent counsel, admitted his guilt, provided explanations to the military judge establishing a factual predicate for his guilty pleas, and said nothing inconsistent with guilt. Appellant admitted during the plea inquiry that he knew that the vehicle was not abandoned. He painted phony identification numbers on the vehicle. He knew that he was not authorized to take the vehicle.

26. If appellant unselfishly repaired the vehicle and used it only to transport injured Marines, I would share the sympathy reflected by the majority of this Court. However, we do not know what evidence would have been presented regarding appellant's taking, modification, and use of the vehicle if the prosecution had presented its case on the merits. *See United States v. Harrison,* 26 MJ 474 (CMA 1988).

27. In *United States v. Kastner,* 17 MJ 11, 15 ¶ 9 (1983), this Court held that "motive is not an element of wrongful appropriation." Thus, a "laudable motive" does not negate criminal intent. 17 MJ at 13 ¶ 6. The mitigating circumstances of appellant's crime were recognized by the Naval Clemency and Parole Board, which remitted the bad-conduct discharge, and by the Court of Military Review, which affirmed a sentence of no punishment. We have no legal authority to grant further clemency.

28. A plea of guilty should not be set aside on appeal unless there is "some 'evidence in "substantial conflict" with' the pleas of guilty." *United States v. Stewart*, 29 MJ 92, 93 ¶ 7 (CMA 1989). A military judge should not reject a guilty plea unless there is "a 'substantial basis' in law and fact for questioning the guilty plea." *United States v. Prater*, 32 MJ 433, 436 ¶ 9 (CMA 1991). There is no legal or factual basis for setting aside the guilty pleas in this case.

29. The lead opinion suggests that, in the absence of a specific prohibition, a servicemember may take another's weapon, field equipment, or vehicle without committing wrongful appropriation, so long as the item is not used for personal gain. I cannot subscribe to this proposition.

30. The lead opinion concedes that appellant wrongfully took the vehicle, 41 MJ at 411 ¶ 8, but concludes that appellant's responses during the plea inquiry were inconsistent with the intent required for wrongful appropriation. 41 MJ at 413 ¶ 12. I find this conclusion internally inconsistent, contrary to the law, and unsupported by the record. The lead opinion recognizes that the offense requires an "intent temporarily to deprive or defraud another person of the use and benefit of property," 41 MJ at 411 ¶ 9. Further, the lead opinion admits that appellant's responses establish "that appellant intended to deprive the custodial unit of simple possession of an inoperable military asset," 41 MJ at 413 ¶ 12, but then—by logic which I cannot accept—concludes that appellant's responses were inconsistent with an intent to deprive the custodial unit of the use and benefit of the property.

31. The lead opinion appears to base this conclusion on the proposition that "[a]n accused must intend to deprive the Government or a unit thereof of *more than mere possession* of its property in order to be guilty of wrongful appropriation." 41 MJ at 412 ¶ 11 (emphasis added). This proposition ignores the plain language of the statute, which provides:

Any person subject to this chapter who wrongfully takes, obtains, or withholds, by any means, *from the possession of the own-er or of any other person* any money, personal property, or article of value of any kind ... *with intent temporarily ... to appropriate it to his own use or the use of any person other than the owner,* is guilty of wrongful appropriation.

Art. 121, Uniform Code of Military Justice, 10 USC § 921 (emphasis added). There is nothing in the statute which requires an intent "to deprive the Government or a unit thereof of more than mere possession."

32. The cases cited in the lead opinion to support that opinion's proposition are inapposite. *United States v. Satey*, 16 USCMA 100, 36 CMR 256 (1966), and *United States v. Graham*, 13 CMR 727 (AFBR 1953), both involved situations in which the accused was in lawful possession of the property in question. They do not involve the element of wrongful taking which appellant admitted. They deal with the offense described by Colonel Winthrop as "misapplication," which is not before us. *See* W. Winthrop, *Military Law and Precedents* 708 (2d ed. 1920 Reprint); and 41 MJ at 411 ¶ 10. Appellant never was authorized to possess or use the vehicle.

33. *United States v. Satey, supra,* was not a guilty-plea case. It was a contested case in which the issue on appeal was whether the instructions were correct. This Court held that the instructions were incorrect because they told the court-martial that expenditure of Imprest Fund moneys in violation of Imprest Fund Regulations constitutes larceny. 16 USCMA at 108, 36 CMR at 264 ¶¶ 29–36.

34. *United States v. Graham, supra,* was a contested case in which the accused was in lawful possession of a vehicle but deviated from the assigned route. The Board of Review reversed the conviction, finding that the evidence failed to show that the deviation was for personal use and was inconsistent with the official use of the vehicle. 13 CMR at 730 ¶¶ 13 and 12.

35. *United States v. Sluss*, 14 USCMA 388, 34 CMR 168 (1964), also is inapplicable to appellant's case, because there was no wrongful taking or intent in *Sluss*. A maintenance technician drew an item from supply

channels, later determined it was not needed, and left it in his private vehicle rather than return it to supply. Our Court determined that there was no wrongful appropriation, even though the accused's acts may have interfered with other maintenance personnel. *Sluss* is inapplicable to appellant's case for two reasons: (1) there was no wrongful taking; and (2) Sluss did not take the property from someone with a superior right to possession. Other maintenance personnel had an equal right to the property, but not a superior right. 14 USCMA at 391, 34 CMR at 171 ¶¶ 8 and 9.

36. In *United States v. Miles*, 11 USCMA 622, 625, 29 CMR 438, 441 ¶ 5 (1960), this Court upheld guilty pleas to wrongful appropriation, based on "scrounging" from another military unit, even though the property remained in government service. Chief Judge Quinn explained his rationale as follows: "By taking the property from one custodian and transferring it to another, the accused effectively deprived the former of his right to possession and subjected him to either criminal or civil liability therefor."

37. In his separate concurrence, Judge Latimer commented on the notion that "an unlawful taking by a member of one unit or Government department from another agency cannot be theft." He soundly rejected such an idea, stating, "In fact, merely to state such a proposition is to recognize its absurdity, and anyone even remotely familiar with property responsibility and accountability at various levels of the chain of supply would reject it out of hand." 11 USCMA at 626, 29 CMR at 442 ¶ 10.

38. Judge Ferguson dissented in *Miles*, reasoning that the accused was carrying out the orders of his company commander and therefore lacked *mens rea*. 11 USCMA at 629, 29 CMR at 445 ¶ 18. He neither accepted nor rejected the comments of Chief Judge Quinn and Judge Latimer, set out above. Nevertheless, a majority of the Court found the pleas of guilty provident, based on the accused's admission that he "scrounged" blankets from another unit for use by his unit.

39. In this case the unit to which the vehicle was assigned was the "owner" and "had the superior right to possession of the property." *See* para. 46c(1)(c)(ii), Part IV, Manual for Courts–Martial, United States, 1984. Appellant deprived that unit of the use and benefit of the property. Someone in that unit was responsible and accountable for the vehicle. No one authorized appellant to take the vehicle or even acquiesced in the taking. The unit to which the vehicle was assigned reported it as stolen.

40. The lead opinion's reference to Chesty Puller's acquisition of abandoned vehicles, 41 MJ at 413 n. 3, has no relevance to this case. Appellant admitted that he knew the vehicle in question was not abandoned, and he made no assertion of military necessity.

41. The lead opinion makes several factual assertions that are unsupported by the record. It asserts that appellant's responses during the plea inquiry established that appellant "exclusively" used the vehicle "to assist American war casualties." 41 MJ at 413 ¶ 12. This language overstates the specificity of appellant's responses. Appellant told the military judge that he used the vehicle "for the Marine Liaison, not so much for the hospital, sir." In my view, this language covers everything from official courier use to unofficial trips to the PX and suggests that Marines other than hospital patients may have used the vehicle.

42. The lead opinion also asserts that appellant converted the vehicle "with direct assistance from the U.S. Government (U.S. Navy Seabees)." 41 MJ at 414 ¶ 14. There is no evidence in the record that the Seabees were acting officially or lawfully when they assisted appellant in his conversion of the vehicle or that they knew he had no authority over the vehicle.

43. The lead opinion also asserts that the vehicle's identification numbers "would allow a clear tracing of this vehicle to himself as the assigned operator." 41 MJ at 414 ¶ 14. This assertion also is unsupported by the record. The most that a vehicle identification number would show is the unit to which the vehicle was issued, not the assigned driv-

er. An administrative vehicle might have numerous authorized and assigned drivers.

In my view, the lead opinion reaches a conclusion contrary to law and unsupported by the record. Accordingly, I dissent.